IN THE
UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 5:15CR00020 |
| : | |
| WARREN EVANS, JR. : | |

## REDACTED STATEMENT OF FACTS

This Statement of Facts briefly summarizes the facts and circumstances surrounding the defendant's, Warren Evans, Jr.'s, criminal conduct at issue in this case. It does not contain all of the information obtained during the investigation or applicable to an accurate Presentence Investigation Report and Sentencing Guidelines calculation.

This Statement of Facts is not protected by proffer agreement or any other agreement, and shall be wholly admissible at trial notwithstanding any Rules or statutes to the contrary, including but not limited to Federal Rules of Evidence 408 and 410 and Federal Rule of Criminal Procedure 11.

Drug Trafficking Conspiracy

From in or around at least February 2013 through October 2014, Warren Evans, Jr., Christopher Rojuan Giles (a.k.a. "Charlie" and "C") and others actively participated in a conspiracy to distribute significant amounts of heroin, a Schedule I controlled substance, and cocaine hydrochloride ("cocaine HCl" or "powder cocaine") and cocaine base ("crack"), Schedule II controlled substances, to customers in and around Winchester, Virginia, and elsewhere. Evans distributed and assisted Giles in distributing more than 1,000 grams of heroin, more than 280 grams of crack, and powder cocaine to the Winchester area during this time period at issue. Giles generally had the pair's heroin sources and Evans had the pair's cocaine sources, and they partnered together for the distribution of the drugs.

Giles received a cellular telephone containing contact numbers for Virginia and West Virginia drug customers and sub-distributors from an early co-conspirator around the end of 2012, and as he and Evans worked together to distribute drugs to those customers, Giles and Evans accumulated additional customers as well. These drug customers and sub-distributors would call Giles on that cellular telephone and other cellular numbers, and would arrange to meet with Giles in order to purchase heroin, powder cocaine, and crack cocaine—with heroin comprising the bulk of the sales. Evans would sometimes answer the phone and arrange sales independently as well. The customers/sub-distributors would typically call Giles when they set off for the trip to Baltimore, Maryland. When they reached the I-70/I-695 split, Giles would tell them where to come in Baltimore in order to meet him to purchase drugs. Common locations

*Defendant's Initials:* \_\_WE\_\_

Page 1 of 8

included the Owings Mills Mall, the Greene Turtle, other locations off of the Security Boulevard exit from I-70, and elsewhere. Customers/sub-distributors purchased quantities of heroin in amounts of 1-2 grams, 3-5 grams, 10-15 grams, 20-30 grams, and up to 100 grams or more at a time, as often as every day. Customers/sub-distributors also purchased quantities of powder cocaine and crack including in gram and half-ounce and ounce quantities at a time, which Evans had procured and "cooked," in addition to the heroin that he and Giles were distributing.

The heroin was pre-packaged by Giles and Evans in a variety of quantities for purchase, including 5-gram and 10-gram bags, and customers/sub-distributors described to law enforcement that Giles always could supply them in any amount requested and never ran out of heroin. Multiple customers/sub-distributors also described to law enforcement that they would often be in parking lots full of cars with Virginia license plates when they arrived at locations to meet Giles; Giles would then arrive to serve them, almost always with Evans, who would count money and hand over the drugs, e.g. Giles kept in touch with and kept track of customers/sub-distributors, including in Winchester, by, for instance, calling individuals to find out about arrests and potential cooperation. Giles and Evans also learned about overdoses from the heroin they distributed, including Giles's learning about the overdose death of T.R.C. the day after it occurred in November 2013; Giles kept Evans fully informed of what was happening. Several witnesses told law enforcement regarding that overdose that Giles knew about the overdose "fast," that it was from Giles's heroin, and that Giles was asking if law enforcement had found out that the heroin was from him.

Since December 2013, the Federal Bureau of Investigation (Baltimore) and the Baltimore County Police Department's Vice/Narcotics Section had been conducting an investigation on Giles (independently of investigation by law enforcement in the Western District of Virginia) and, as a result of that investigation, law enforcement executed search warrants on two residences attributed to Giles in May 2014. Law enforcement found, at the home where Giles was residing, approximately $60,000 in cash, 12 grams of crack, smaller amounts of oxycodone and marijuana, and 18 cell phones. At an apartment that Giles frequented and where Evans was living with his girlfriend, law enforcement located and seized approximately $4,000 in cash, 93 grams of powder cocaine, 10 grams of heroin, and three firearms.

Two specific firearms of the ones recovered have been confirmed to have come from Virginia/West Virginia customers and sub-distributors, and Evans traded drugs for them as part of this conspiracy. Evans traded drugs for those two specific firearms, in addition to other firearms, for protection of his and Giles's drugs and money.

Overdose Death of T.R.C.

On November 17, 2013, emergency medical and law enforcement personnel responded to a residence on Berryville Avenue in Winchester / Frederick County, Virginia. Personnel found T.R.C. deceased upon their arrival, in a bathroom with drug paraphernalia (such as a syringe and aluminum foil) next to her. T.R.C. had been found by her grandparents and another family member, who attempted to revive her.

*Defendant's Initials:* WE

Law enforcement recovered T.R.C.'s cellular telephone and, upon execution of a search warrant on the phone's data, identified multiple text messages reflecting that T.R.C. had purchased heroin from Giles and brought it back to Winchester / Frederick County the evening before. T.R.C.'s call logs also included multiple calls to XXX-XXX-7089 labeled "Charlie (BTown)." Text messages reflect that T.R.C. tried to get Giles's telephone number earlier in the evening, and then received it from a friend. That friend explained to law enforcement that T.R.C. had mislaid the number and did, indeed, get it from her that evening. T.R.C. also met with that friend upon her return from Baltimore to share some of the 1-2 grams of heroin she had purchased (and which she told her friend she had purchased) from Giles. T.R.C. further described her evening and how long she had waited to meet Giles in Baltimore, which was corroborated by the telephone records; multiple phones' records confirmed that the heroin came from Giles. A male individual who rode to and from Baltimore with T.R.C. that evening similarly confirmed the course of events, including T.R.C.'s references to "Charlie" on the drive and meeting him in Baltimore.

T.R.C.'s friend had herself purchased heroin from Giles on multiple occasions previously, and noted that the heroin T.R.C. purchased that evening was consistent with the heroin that the friend had herself been purchasing from Giles. The friend continued to see Giles after T.R.C.'s death, and confirmed to law enforcement that Giles knew about T.R.C.'s death, which was similarly indicated by two separate witnesses who said that Giles knew about "[T.R.C.'s first name]'s" overdose and that the heroin had come from him. The friend said that she was talking to Giles on the phone about a week after T.R.C. died, and Giles asked if she had known T.R.C. Giles made the comment that he had heard that T.R.C. overdosed and that T.R.C. had just come to see him with a male.

The telephone bearing number XXX-XXX-7089 was recovered from Giles's residence upon the search warrant executed in May 2014 (described above). Toll records between that number and T.R.C.'s confirm 24 contacts that evening in a single hour, when T.R.C. and Giles met. That phone contained 221 West Virginia/Virginia contacts, consistent with being Giles's West Virginia/Virginia-based drug customer phone used until January 2014.

Lab analysis and other evidence indicated that the heroin from Giles that evening also contained fentanyl. Heroin/fentanyl mixtures were common coming from Baltimore at that time. The assigned Medical Examiner from the Virginia Department of Health determined T.R.C.'s cause of death as "Combined adverse effects of heroin, fentanyl, and hydrocodone," because each of those function as Central Nervous System depressants. Results of the toxicology showed levels of 0.15mg/L of morphine in the blood and 0.03mg/L in the Vitreous Humor, as well as 6-Acetylmorphine (which demonstrates that T.R.C. used heroin) in the Vitreous Humor. (The human body metabolizes heroin into 6-Acetylmorphine (which is short-lived), and then into morphine.) The toxicology also showed levels of fentanyl at .012 mg/L in the blood and .03 mg/L of hydrocodone in the Vitreous Humor. The assigned forensic toxicologist who certified the results of the toxicology indicated that the levels of both heroin and fentanyl were consistent with lethal doses of each drug, although T.R.C. might have been alive if she had just had the fentanyl, rather than both the heroin and the fentanyl. In her expert, medical opinion, the presence of the hydrocodone was insignificant. The Medical Examiner indicated that she had

*Defendant's Initials:* _____

seen hydrocodone levels at least as high as that in T.R.C.'s blood in erratic drivers in the past, and that the morphine level in the blood was certainly enough to kill a person.

Overdose Death of R.F.L.

On March 19, 2014, Giles sold heroin to Scott Matthew Pierce, who had traveled from Winchester to Baltimore to purchase 3 grams of heroin and crack cocaine from Giles. Evans was with Giles at least half the time when Giles met specifically with Pierce at this time. After his return to Winchester, Pierce connected with Brandy Dawn Kelly, who arranged a heroin transaction with R.F.L. At approximately midnight on March 19-20, 2014, Pierce and Kelly distributed 3 "bags" (approximately .1g each) of heroin, which had come from Giles and Evans, to R.F.L. for $100.

Text messages between R.F.L. and Kelly from March 19, 2014 confirm their arrangement for the distribution of heroin to R.F.L., including a text message referring to R.F.L.'s purchase of "3 4 100," which refers to a purchase of 3 "bags" of heroin for $100 (a typical price in Winchester for that quantity of heroin). Toll records from Pierce and Giles similarly confirm their contacts on March 19, 2014, encompassing that distribution of heroin from Giles to Pierce, which he redistributed, in part, in Winchester. Specifically, phone records from March 19, 2014 confirm 39 contacts to and from phone number XXX-XXX-9372 attributed to Giles, and multiple calls consistent with Giles's modus operandi of individuals' calling him before leaving Winchester and again while en route to Baltimore to the meet location (determined by Giles and Evans while travel was ongoing).

The telephone bearing number XXX-XXX-9372 was recovered from Giles's residence upon the search warrant executed in May 2014 (described above). That phone contained 249 West Virginia/Virginia contacts, consistent with being Giles's West Virginia/Virginia-based drug customer phone at that time.

In addition, law enforcement conducted three controlled purchases of heroin from Giles and Evans in February and March, 2014 – of quantities including 10 grams, 14 grams, and 13 grams – where Giles used the phone number XXX-XXX-9372.

Emergency medical personnel responded to R.F.L.'s residence in Winchester / Frederick County at approximately 7:18am on March 20, 2014, in response to a 911 call. The emergency medical personnel found R.F.L. deceased upon their arrival, with "fresh track marks" on her right arm. Law enforcement located a variety of syringes and drug paraphernalia at the residence, including a syringe in a purse in R.F.L.'s bedroom which also contained paperwork in R.F.L.'s name. R.F.L. was a periodic user of cocaine, but was a much less frequent user of heroin. Three individuals indicated that R.F.L. had attempted but failed to get cocaine that evening, and had gotten heroin when she could not get the cocaine.

The assigned Medical Examiner determined R.F.L.'s cause of death as "Acute combined heroin and cocaine poisoning." The Medical Examiner's report noted: "Postmortem toxicological analysis of iliac blood was positive for a lethal level of morphine. 6-Acetylmorphine was detected in the vitreous humor indicative of heroin. Also present and

*Defendant's Initials:* WE

contributing to death was cocaine." (Results of the toxicology showed levels of 0.23mg/L of morphine in the blood and 0.058mg/L in the Vitreous Humor, as well as 6-Acetylmorphine in the Vitreous Humor. Results of the toxicology showed levels of 0.062mg/L of cocaine in the blood and .012 mg/L in the Vitreous Humor.) The Medical Examiner explained that the 0.23mg/L level of morphine is considered a lethal level, and the 6-Acetylmorphine present in the Vitreous Humor shows this was an acute reaction, with R.F.L.'s injection with heroin occurring around the time of death. The Medical Examiner added that in her opinion, the level of morphine would surely be enough to cause at least serious bodily injury to a person.

The assigned forensic toxicologist who certified the results of the toxicology has similarly explained that the 0.23mg/L level of morphine is consistent with a lethal dose of heroin, and that this is at the high end of levels of morphine that her office has been seeing in lethal overdoses. She stated that the office regularly sees levels of cocaine in drivers that match the level found in R.F.L.'s toxicology, and that those levels were consistent with R.F.L.'s having used cocaine in an earlier part of the day rather than close in time to her death – which was consistent with witness statements. She added that, in her opinion, without the morphine found in the submission, R.F.L. would have had, at the least, a much better chance of being alive.

Overdose of J.H.H.

On March 21, 2014, Eric Keith Pennington distributed heroin to Colin Patrick Butler in Winchester. Telephone toll records indicate that Pennington had purchased that heroin from Giles in Baltimore on March 19, 2014 (using Giles's phone number XXX-XXX-9372), consistently with multiple contacts and purchases of heroin from Giles and Evans using both XXX-XXX-9372 and XXX-XXX-7089. Butler, in turn, distributed a portion of that heroin to J.H.H., a friend of Butler's who was visiting from Colonial Beach, Virginia. Pennington sold the heroin to Butler at the residence of David Joshueh Medina, who had facilitated the transaction between Butler and Pennington on that date and was present at the time of the transaction. Butler purchased 3 "bags" (approximately .1g each) of heroin for $100 from Pennington.

When Butler and J.H.H. were both back at Butler's residence in Winchester, Butler used some of the heroin himself and injected J.H.H. with heroin. J.H.H. lost consciousness and collapsed shortly after Butler injected him with the heroin. Butler and another resident at that residence attempted CPR on J.H.H., and called 911. Emergency medical and law enforcement personnel responded to the residence, and found J.H.H. unconscious, unresponsive, with cyanotic skin, and with a respiration rate of only two breaths per minute. Emergency medical personnel initiated life-saving measures and J.H.H. started to revive after receiving multiple doses of Narcan (an "opioid antagonist" used to counteract the effects of an opiate overdose) via intraosseous (IO) infusion. Additional Narcan was also administered, totaling 2.8mg of Narcan. J.H.H. was transported to the hospital and ultimately survived the overdose. The Medic/Attendant in Charge informed law enforcement that in her expert, professional opinion, if she had not administered the Narcan in the amount she administered during the timeframe she did, J.H.H. would have died from the overdose.

*Defendant's Initials:* \_WE\_

## Overdose of B.D.W.

On April 5, 2014, Stephanie Diane Alkire distributed heroin in Winchester, the use of which resulted in the serious bodily injury of B.D.W. Alkire had traveled to Baltimore earlier that day and purchased heroin from Giles, a portion of which she distributed that evening. Specifically, Alkire sold three $50 bags of heroin (small, purple bags) that B.D.W. ultimately used at the residence of Donna Jean Jenkins. Toll records confirm Alkire's statements regarding purchasing that heroin from Giles that day, using the phone number of Giles's XXX-XXX-9372, a phone which was, again, recovered from Giles's residence in May 2014. One witness at the residence recounted that upon B.D.W.'s using that heroin, B.D.W. immediately lost consciousness, and another then saw her with blue lips, a pale face, and her eyes rolled back into her head. Individuals at the residence attempted to revive her, began CPR, and called 911. Jenkins described B.D.W.'s face and lips as blue and said she assumed B.D.W. was not breathing because of how blue she was.

Winchester Police Department (WPD) and Winchester Fire and Rescue (FCFR) personnel were dispatched to the residence for the suspected heroin overdose. Upon arrival, the EMTs found B.D.W. apneic and unresponsive; they began ventilations and administered .4mg of Narcan, and B.D.W. began to respond upon that administration of Narcan. EMTs administered a second dose of .4mg of Narcan, and B.D.W. ultimately revived.

Upon a search of the residence, law enforcement located a syringe and other drug paraphernalia, and two small purple baggies which contained a white-tan powder that was analyzed by the Virginia lab and was confirmed to contain heroin.

The lead EMT concluded that without the medical intervention – and, specifically, without the Narcan – B.D.W. would have died. Her respirations when he first arrived were only 0-2 breaths per minute. The Emergency Room doctor, who was interviewed on the evening of the overdose, similarly stated that if the EMT had not provided Narcan to B.D.W. and had left her untreated, she would have died. At the hospital, B.D.W. consented to a search of her blood, which found a BAC of .173%, and a level of morphine of .028mg/L, which is consistent with a heroin overdose and the amount of time that had passed between the ingestion of heroin and the taking of B.D.W.'s blood sample. The assigned forensic toxicologist for the Virginia Department of Forensic Science confirmed that the level of morphine was consistent with B.D.W. having survived a heroin overdose (and having continued to metabolize heroin), and that the level of alcohol, even accounting for the passage of time from the time of the heroin exposure, would not have posed a risk of death. (The toxicology also revealed traces of marijuana, which the forensic toxicologist confirmed would not have posed any danger to B.D.W.)

## Overdose of G.R.F.

On September 5, 2014, S.M. distributed heroin in Winchester, the use of which resulted in the overdose of G.R.F. S.M. had gotten that heroin ultimately from Giles and Evans in Baltimore, and sold the heroin to G.R.F. at a convenience store in Winchester. Toll records confirm that the heroin was purchased from Giles the day before, as was reported to law

enforcement by a witness, using the phone number of Giles's XXX-XXX-5613—a phone which was seized from Giles upon his arrest in October 2014.

Law enforcement had been dispatched to G.R.F., finding him unconscious in the driver's seat of his vehicle with the needle from injecting heroin still in his arm. Emergency medical responders attended to G.R.F., and he regained consciousness only upon the administration of Narcan. Medical records confirmed that G.R.F. suffered a heroin overdose that rendered him unconscious, and that Narcan revived him.

Law enforcement located a syringe and a spoon with residue in G.R.F.'s pants pocket, and a piece of tin foil containing what G.R.F. admitted to be heroin in another pocket. The powder in the tin foil was analyzed by the Virginia Department of Forensic Science and was confirmed to contain heroin.

Overdose Death of B.E.W.

In October 2014, J.D.B. distributed heroin in Winchester to J.M.G., who distributed a portion of that heroin to B.E.W. J.D.B. had traveled to Baltimore and purchased 35 grams of heroin from Giles on October 5, 2014; he had previously purchased amounts up to 100g-110g of heroin from Giles and Evans. He had been using Giles's phone number XXX-XXX-5613—a phone which was, again, seized from Giles upon his arrest in October 2014.

Toll records of J.D.B.'s cellular telephone confirm 24 contacts to/from Giles on October 5, 2014, consistently with J.D.B.'s typical practice of calling Giles upon leaving Winchester, when at the split, and when at the meet location.

Law enforcement responded to a hotel in Winchester on October 12, 2014 based upon a 911 call from hotel personnel who had located B.E.W., apparently deceased. Law enforcement recovered a small amount of heroin on the dresser next to where B.E.W. was sitting, deceased, in a chair. The room had been rented under the name of J.M.G., and J.M.G. and B.E.W. had been observed checking in on October 10, 2014. J.M.G. returned to the hotel on October 11, 2014, and saw that B.E.W. was in distress, but departed, and B.E.W. was discovered by hotel personnel the next day.

The assigned Medical Examiner determined B.E.W.'s cause of death as "Combined adverse effects of heroin and hydrocodone." The Medical Examiner's report noted: "Postmortem toxicology is negative for ethanol and positive for heroin at a level reported for fatalities and hydrocodone at a supratherapeutic level." (Results of the toxicology showed levels of 0.062mg/L of morphine in the blood and 0.049mg/L in the Vitreous Humor, as well as 6-Acetylmorphine in the Vitreous Humor. Results of the toxicology showed levels of 0.035mg/L of hydrocodone in the blood and .066 mg/L in the Vitreous Humor.) The Medical Examiner stated that the level of hydrocodone could be present in impaired drivers, and the toxicology results were consistent with what one might see if an individual took hydrocodone and then added heroin in order to enhance the high. The assigned forensic toxicologist who certified the results of the toxicology explained that the quantity of hydrocodone was not too high, and that the 6-Acetylmorphine was indicative of a heroin overdose. In her expert, medical opinion,

*Defendant's Initials:* \_\_W/E\_\_

without the morphine, he would have lived. She said she had seen levels of hydrocodone 3-4 times as high as that level in individuals who had been driving around.

I have reviewed the above Statement of Facts with my attorney and I agree that it is true and accurate. I agree that had this matter proceeded to trial, the United States would have proven the facts outlined above beyond a reasonable doubt.

1/27/16
Date

*Warren Evans*
WARREN EVANS, JR.
Defendant

1-27-16
Date

R. DARREN BOSTIC, Esq.
Attorney for Defendant