IN THE
UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| UNITED STATES OF AMERICA | Criminal No.: 5:15CR00020 |
|---|---|
| v. | |
| WARREN EVANS, JR., | Violations: |
| | 21 U.S.C. §§ 846 & 841(b)(1)(A), (C) |
| Defendant. | 21 U.S.C. §§ 846 & 841(b)(1)(C) |

## **SENTENCING MEMORANDUM OF THE UNITED STATES**

### INTRODUCTION AND BACKGROUND

Warren Evans's long-term conduct at issue in this case was very serious and had tragic consequences for other people's lives. At least six people would not have died or nearly died when they did, were it not for the actions of Evans, who was Christopher Giles's drug-distribution partner, and Giles. Evans was known to the Winchester community by the nickname "Charlie's brother," with Giles being "Charlie" and "C." T.R.C., R.F.L., J.H.H., B.D.W., G.R.F., and B.E.W. bought heroin from these high-quantity dealers or their sub-distributors, used it, and either died or only lived due to emergency intervention; the evidence showed they would have died. This case is about these overdoses on heroin that came from Giles and Evans; Evans's sentence needs to reflect the deaths and other overdoses that occurred here.

In this partnership, as reflected in the Statement of Facts and other information in this case, Evans was fully involved and informed on all the heroin dealings and he actively participated in them, handling the money and the drugs in the meetings with customers and sub-distributors—and storing the heroin and other drugs where *he* was living, along with guns. He

kept selling that heroin with Giles even though, the evidence showed, he knew about the death of T.R.C. from this heroin in November 2013 right after it occurred. He kept distributing drugs for months after a May 2014 Baltimore arrest (along with Giles) and awaiting Baltimore court proceedings (for which he failed to appear, during the time he was being sought on the federal criminal complaint)—and at least through Giles's ultimate federal arrest in October 2014. As noted in the Presentence Investigation Report ("PSR"), Evans was supporting himself fully financially through these sales of large quantities of drugs with Giles.

Unfortunately, indeed, this was a highly effective partnership. Evans and Giles were very good at what they did. Dozens of Winchester-area heroin customers and sub-distributors reported that once they found "Charlie," they liked him, and he always had drugs to sell. A "one-stop-shop," they said, he and Evans sold powder and "crack" cocaine (which Evans acknowledges he procured and "cooked" himself) in addition to heroin, and customers recalled seeing Giles with a backpack full of drugs and never running out. Just as Giles kept in touch with their customers when he didn't see them, Evans similarly answered the phone and facilitated transactions with the customers; their business was organized and took thought. Law enforcement found that this partnership was so effective that, for what was moving towards two years, "Charlie" was the dominant name in the market of heroin sales from Baltimore to Winchester-area residents—and Evans was his full-time, fully-integrated partner. Of particular concern here, too, Evans traded drugs for at least two specific firearms that were identified (and seized) by law enforcement, for protection of his and Giles's drugs and money.

This was not a venture of distributors who were "hanging out," "sharing" drugs that led to overdoses, or selling them to supply the distributors' own habits. To the contrary, these were large-scale sales, a profitable venture, selling 10-15, 20-30, and up to 100-110 grams of heroin at

a time, in addition to the other drugs. Giles and Evans targeted their customers because they could make more money selling to Virginians and West Virginians than they could selling to Baltimore residents, and they made such money that on a single date in May 2014, for example, $60,000 was seized, by Baltimore law enforcement, from Giles's home. Where Evans was living with his girlfriend, on that same date, law enforcement found and seized approximately $4,000, 93 grams of powder cocaine, 10 grams of heroin, and three guns.

Of particular relevance, too, before Giles's federal arrest in October 2014, a Virginia State Police record of overdoses reported to the Northwest Virginia Regional Drug and Gang Task Force—which covers Winchester, for example—showed an average of at least two overdoses per week in 2014. Around May—when Baltimore law enforcement executed the search warrants at their homes—the sales dropped off briefly. And from November into December 2014, after Giles was finally in federal custody and this partnership was therefore disrupted, there was less than one per week.

Importantly, as well, Evans has a notable criminal history, including at least six prior felony drug convictions shown in the PSR—which is at least twice the number Giles had—and is a "career offender" under the United States Sentencing Guidelines. His history also displays repeated violations of supervision and multiple prior convictions that are not counted in his criminal history score—such that the highest Criminal History Category even understates his conduct. Finally, Evans's case does not have the unique circumstances described in the sentencing memorandum of Giles, which factored into Giles's sentencing in April of this year.

Taking all of the considerations into account, the United States respectfully recommends acceptance of the plea agreement and imposition of a sentence of imprisonment of between 360 and 372 months (30 to 31 years), to best serve the goals and purposes of sentencing here. This

sentence is encompassed in the agreed-upon range under Federal Rule of Criminal Procedure 11(c)(1)(C) (as well as being within Evans's advisory Guidelines range after the benefits of the plea agreement) and will appropriately implement the factors to be considered under 18 U.S.C. § 3553(a) and satisfy the purposes of sentencing. Evans did accept responsibility and pled guilty in this case, acknowledging the conspiracy and six overdoses from this heroin. The plea agreement provides Evans with significant benefits, therefore, including releasing him from the possibility of exposure to mandatory life imprisonment in light of 21 U.S.C. § 851, to which he could have been subject for the drug-weight of heroin, or of his personally-cooked "crack" cocaine, or for any one of the six overdoses.

## PROCEDURAL HISTORY

On April 14, 2015, a criminal complaint and arrest warrant were issued for Evans by the Honorable James Welsh, United States Magistrate Judge. Efforts by law enforcement to locate him remained unsuccessful until his ultimate arrest in Baltimore on July 1, after which he was transferred to this District. During that time, Evans failed to appear for trial in Maryland state court in June 2015.

Evans had his initial appearance and a bond hearing in this District on July 20, 2015, before Judge Welsh, and was continued in custody.

The next day, a federal Grand Jury returned a two-count Indictment against him, charging him with, from in or around approximately February 2013 and continuing through October 2014, conspiracy to distribute and possess with intent to distribute: (a) 1,000 grams or more of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A);[1]

---

[1] According to the Drug Enforcement Administration, Schedule I drugs, substances, or chemicals are defined as those with no currently accepted medical use and a high potential for abuse. They are the most dangerous drugs of all the drug schedules with potentially severe

4

(b) 280 grams or more of a mixture and substance containing a detectable amount of "crack" cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A); and (c) cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), all in violation of 21 U.S.C. §§ 846, 841(b)(1)(A), and 841(b)(1)(C) (Count One); and with conspiracy to distribute and possess with intent to distribute heroin, the use of which resulted in the serious bodily injury and death of R.F.L., on or about March 19, 2014, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count Two).

On January 27, 2016, Evans entered his plea of guilty to both counts of the Indictment, pursuant to Rule 11(c)(1)(C), in exchange for a sentence of imprisonment of between 282 months (23.5 years) and 372 months (31 years). Evans agreed that a sentence of imprisonment within this range was a reasonable sentence for his conduct charged, considering all the facts and circumstances of the case. To enable this plea, the government stipulated that it would not pursue any notice of enhancement under Section 851; and the government also did not pursue any superseding charge(s) under 18 U.S.C. § 924(c) due to Evans's gun-for-drugs trades. Evans acknowledged his understanding that if he had been convicted of any instance of distribution of heroin resulting in serious bodily injury or death, or if he were convicted of a 1,000-gram heroin or a 280-gram "crack" cocaine conspiracy, and a notice were pursued against him under Section 851 based upon his prior qualifying drug convictions, he would be subject to a mandatory minimum term of imprisonment for life. He acknowledged that if he were charged under 18 U.S.C. § 924(c), he would be subject to additional mandatory minimum penalties, as well.

Evans and the United States agreed that the following Guidelines sections applied to his convictions, namely a base offense level of 38 under U.S.S.G. § 2D1.1(a)(2) because death or

---

psychological or physical dependence. *See, e.g.*, http://www.dea.gov/druginfo/ds.shtml.

serious bodily injury resulted from the use of the heroin, and U.S.S.G. § 2D1.1(b)(1) because a firearm(s) was possessed. Evans acknowledged that he could otherwise also potentially be subject to a base offense level of 43 pursuant to U.S.S.G. § 2D1.1(a)(1), based upon his prior drug convictions. He understood that because of his prior criminal record, he could be treated as a "career offender" under the Guidelines.

The sentencing hearing is currently scheduled for June 15, 2016.

## DISCUSSION

District courts generally must perform the following four steps in sentencing defendants after *United States v. Booker*, 543 U.S. 220 (2005): (1) "properly calculate the sentence range recommended by" the advisory Guidelines; (2) "determine whether a sentence within that range and within statutory limits serves the factors set forth in [18 U.S.C.] § 3553(a) and, if [it does] not, select a sentence that does serve those factors;" (3) implement any applicable mandatory statutory limitations; and (4) articulate, on the record, "the reasons for selecting the particular sentence" and especially, if applicable, "explain[] why a sentence outside of the Sentencing Guidelines range better serves the relevant sentencing purposes set forth in § 3553(a)" than one within it. *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006); *see Booker*, 543 U.S. at 260-65, 268; 18 U.S.C. § 3553(a).

In this case, the plea agreement is under Rule 11(c)(1)(C) and is therefore, ultimately, not based on the Guidelines. *See, e.g.*, *United States v. Law*, 348 F. App'x 849, 851 (4th Cir. 2009) ("A sentence imposed pursuant to a Rule 11(c)(1)(C) plea agreement is contractual and not based upon the guidelines."); *see also, e.g.*, *United States v. Terry*, No. 1:10-CR-32 (TLS), 2012 WL 688839, at *2-3 (N.D. Ind. March 1, 2012) (discussing such agreements in the context of subsequent amendments to Guidelines ranges); *United States v. Lamb*, No. 1:09-CR-107 (WCL),

2012 WL 1434337, at *2 (N.D. Ind. April 25, 2012) (same). The government is aware that it is this Court's regular practice to compare Guidelines ranges to sentences and ranges agreed-to in Rule 11(c)(1)(C) pleas—in order to help guide its decision to reject or accept the plea agreement, *see* U.S.S.G. § 6B1.2—but the Court is not actually obligated to do so because the Guidelines are advisory only.

I.   The Defendant's Advisory Sentencing Guidelines Range

Consistently with the stipulations in the plea agreement and the facts established at the plea hearing, the PSR assigns Evans a base offense level of 38 under U.S.S.G. § 2D1.1(a)(2) and adds 2 points for the firearm(s) under U.S.S.G. § 2D1.1(b)(1). PSR ¶¶ 20, 21. Because the resulting offense level is higher than the level called for under the "career offender" Guideline, the higher offense level applies—as noted in the PSR in paragraph 26. The PSR anticipates the full three-point reduction for acceptance of responsibility, and the government does anticipate moving for the third-point reduction at the sentencing hearing in this case, based on Evans's guilty plea. PSR ¶¶ 27-28. The resulting total offense level is 37. PSR ¶ 29.

The PSR then outlines Evans's criminal history, which includes at least six prior felony drug convictions, *see* PSR ¶¶ 33, 36, 38, 40, 42, 44; numerous other drug-related convictions (including multiple ones that do not receive criminal history points), with several sentences to five years' imprisonment, PSR ¶¶ 31-44; and many failures to comply with terms of bond and supervised probation. Based on these convictions and the fact that Evans was under a criminal justice sentence at the time of the instant drug conspiracy, the PSR assigns him 18 criminal history points, which results in a Criminal History Category of VI. PSR ¶¶ 45-47. Because he qualifies as a "career offender," his ultimate Criminal History Category would be VI through that calculation, as well. PSR ¶ 47. (Giles had only two prior felony drug convictions and a Criminal

7

History Category of V before application of the career offender guideline.)

Evans also has pending Maryland state-court drug and gun charges, PSR ¶ 49, in which case he failed to appear for trial, and even more prior arrests for drug and gun and some violent charges—over the past 20 years, PSR ¶¶ 50-60.

A total offense level of 37, combined with a Criminal History Category of VI, yields an advisory Guidelines range of imprisonment of 360 months to life imprisonment. PSR ¶ 73. The plea agreement's sentencing range of 282 to 372 months' imprisonment, if accepted by the Court, facilitated the possibility of a lower sentence that is years below the bottom of the adjusted advisory Guidelines range, and otherwise caps the sentence at the lowest part of that range. It thus placed a significant cap on his exposure in this case and, again, relieved him from exposure to a possible mandatory statutory (and Guidelines) penalty of life through several different means and to five additional mandatory years if he had been charged and convicted under 18 U.S.C. § 924(c). Further, notably, the Guidelines range upon Evans's guilty plea does not reflect any increase due, for instance, to the drug weight in this case or to the fact that more than one overdose was involved.

## II. The Section 3553(a) Factors Support A Sentence of Between 360 and 372 Months' Imprisonment

According to a review of all of Section 3553(a)'s sentencing factors, the most appropriate sentence is a sentence of between 360 and 372 months' imprisonment. "The [C]ourt shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing listed in that section. 18 U.S.C. § 3553(a). In determining a sentence, the Court shall consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the need for the sentence imposed" to promote such interests as "reflect[ing] the seriousness of the offense," "promot[ing] respect for law," "provid[ing] just punishment,"

8

"afford[ing] adequate deterrence," and "protect[ing] the public;" (3) "the kinds of sentences available;" (4) "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the" applicable Guidelines; (5) "any pertinent policy statement" issued by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;" and (7) "the need to provide restitution to any victims of the offense." *Id.*

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The government respectfully refers the Court to the signed Statement of Facts filed in this case and to the PSR, for the relevant background. Evans's case lacks the mitigating circumstances that were described (some under seal) in the case of Giles. The nature and circumstances of the offense here, with its dire consequences for the lives of others, are incredibly serious—and Evans's history and characteristics are aggravating, as well.

The undersigned has noted that death is different in a variety of prior sentencing memoranda before this Court—starting as the heroin epidemic began its sweep through the Northern part of the Western District of Virginia. Indeed, this Court has previously sentenced seven sub-distributor defendants on the overdoses from this specific partnership's heroin, as well as Giles in April to 25 years' imprisonment. But this case is both even more different from the sub-distributors' cases and lacks the unique factors present for Giles. As opposed to all of the sub-distributors, which had one death each, or two, or one overdose, or two, this case has six. Death, and this case, are both different; and Evans's and Giles's cases are unprecedented in their numbers. Evans was, with Giles, higher up the "chain" of drug supply, where it was animated and framed by money and not addiction. This kind of case is why we are here, targeting such

9

dangerous and predatory conduct that we want to discourage and deter.

This partnership's level of organization merits additional mention, as well, as outlined in the Statement of Facts. According to the customers and sub-distributors, they would be in parking lots full of cars with Virginia license plates when they arrived at locations to meet, and they would be served by Giles and Evans together, with partnered handling of the drugs and money. Although the revised PSR reflects a claim by Evans that he was not actually aware of at least one specific instance where the overdoses resulting from this partnership's heroin resulted in death—although he admits throughout that he was at least in general terms aware of the overdoses—the Statement of Facts and other evidence showed that Giles and Evans knew about T.R.C.'s death the day after it occurred in November 2013, and yet they continued to engage in this trade for almost another year while more people were overdosing and dying. As noted in the Statement of Facts, "Giles and Evans also learned about overdoses from the heroin they distributed, including Giles's learning about the overdose death of T.R.C. the day after it occurred in November 2013; Giles kept Evans fully informed of what was happening." (Statement of Facts, at 2.) Nor is such knowledge—of overdoses either generally or specifically—even required in these cases.

The government does not try to escape that all of the users of heroin and other drugs made their own choices that brought them to where they were and that many factors are at play in our opioid epidemic. But we must specifically consider Evans's choices and role in this case, continuing his full partnership with Giles. We must consider the stories and love that will have followed T.R.C., R.F.L., and B.E.W., who died. We must consider the horror of R.F.L.'s husband and best friend, who found her dead early in the morning on March 20, 2014, and who tried, and failed, to resuscitate her. Of T.R.C.'s grandparents, who found her dead in their

10
Case 5:15-cr-00020-MFU   Document 46   Filed 06/08/16   Page 10 of 19   Pageid#: 295

bathroom after she had come to visit them.  A family member tried, and failed, to resuscitate her.  And of the other individuals who suffered these heroin overdoses.  Evans, like Giles, was certainly not the whole problem.  But for a not insignificant period of time, he was wholly a part of it.  And the actions that can be taken by the criminal justice system in cases like this are certainly not the whole solution.  But they are wholly a part of it.  One wishes things could have happened differently.  One wishes Giles and Evans could have turned to almost anything other than distributing drugs.

Evans knew what it was like to use drugs and yet he spread the poison of heroin and continued to supply hundreds of customers, long after he knew people were dying—in order to make more money.  In addition, Evans has had many prior convictions and kept committing more crimes—including these—while on bond and supervision for years, turning down countless chances to choose a different life.  He has at least six prior felony drug convictions, multiple other drug-related convictions that do not even receive criminal history points, and many failures to comply with terms of bond and supervised probation that all showcase the need for the requested sentence here.

After this conduct, though, although there were not the same unique circumstances as Giles had, Evans did accept responsibility in this case through his prompt guilty plea to the initial indictment, and the plea agreement attempted to give significant benefits because of that and in case other factors needed ultimately to be considered (which they do not).  The government understands that the requested sentence here is a lengthy one, but despite Evans having left a trail of havoc and despair, he will be out of prison while he is still in his sixties.  The government's sentencing recommendation attempts best to balance the aggravating and mitigating factors here.  Accordingly, although Evans would have been subject to a mandatory life sentence under the

law (through drug weight on two different drugs or even a single overdose)—or additional gun penalties—he will now get out of jail. The government, again, knows the requested sentence is a long time and would by no means presume to suggest otherwise. But 30 to 31 years is a length that is necessary under the devastating circumstances here.

      B.      **The Need for the Sentence Imposed to Comply with the Purposes of Sentencing Outlined in Section 3553(a)(2)**

Even a single resulting fatal overdose would place this case among the most serious drug offenses. Indeed, the havoc that heroin and heroin overdoses—both fatal and non-fatal—have wreaked in the Winchester area is deeply familiar to this Court. Heroin overdoses exploded nationwide starting several years ago—with Giles and Evans on the front lines of that trend for this District—and the criminal justice system has been playing an important role in working to respond to this community epidemic and threat to public safety. Here, there are three fatal and three more near-fatal ones. The needs for the sentence to reflect the seriousness of the offense, promote respect for law, provide just punishment, afford adequate deterrence, and protect the public counsel for a sentence no lower than the government's recommendation.

Even for a single near-fatal overdose, Congress has endorsed the "deterrent value in exposing a drug trafficker to liability for the full consequences, both expected and unexpected, of his own unlawful behavior," *United States v. Valencia-Gonzales*, 172 F.3d 344, 346 (5th Cir. 1999), and "[t]he statute puts drug dealers and users on clear notice that their sentences will be enhanced if people die from using the drugs they distribute," *United States v. Patterson*, 38 F.3d 139, 145 (4th Cir. 1994). In other words, given the horribly dangerous consequences of drug distribution, the overdose enhancement appropriately "serves to elevate the crime of knowingly or intentionally distributing heroin to a more serious level." *United States v. Alvarado*, No. 14-4338, 2016 U.S. App. LEXIS 4253 (4th Cir. Mar. 7, 2016). To reflect this seriousness and to

12

deter and protect the public from Evans, the recommended sentence is necessary.

The sentence must, indeed, account for Evans's continuous returns to criminal activity and his troubling criminal history, which includes repeated resistance to supervision and the dangers he posed to the public both through his drug conduct and accumulating guns. The fact that Evans engaged in continuing drug distribution despite his criminal history and being on supervision also weighs towards a significant sentence. Dangerous drug distribution was Evans's way of life. He was not deterred by prior threats of return to jail; he was not deterred by knowing that people were overdosing and dying from the heroin he helped sell. Deterrence and protecting the public—and promoting respect for law—are salient needs in this context, and they have not been accomplished by multiple prior sentencings, including for felony drug offenses. The government argues for its recommended sentence in part to provide deterrence both to Evans and to those who are following this case or may learn about it at a later time—and Evans must receive such a sentence in order to be prevented and deterred from returning to this way of life.

At the same time, the United States seeks—and sought through the plea agreement—to reflect Evans's acceptance of responsibility for his conduct in this case. The plea agreement provides significant benefits in this regard which the specific recommended sentence confirms.

The United States thinks that drug treatment and any desired vocational training for Evans would be beneficial.

The government is not aware of any other specific needs with respect to training, care, or treatment.

**C.    The Kinds of Sentences Available**

Pursuant to 21 U.S.C. §§ 846, 841(b)(1)(C), and 841(b)(1)(A), and given the benefits of the plea agreement, Evans faces a statutory sentence of imprisonment of up to life imprisonment

with a mandatory minimum term of 20 years (via Count Two, the overdose charge under 21 U.S.C. § 841(b)(1)(C)), a fine of up to $11,000,000 (looking to the drug-weights in Count One under 21 U.S.C. § 841(b)(1)(A) and the additional fine enabled by Count Two), and a period of supervised release of at least five years (looking again to the drug-weight charge under 21 U.S.C. § 841(b)(1)(A)). There is a mandatory special assessment of $200. 18 U.S.C. § 3013. Probation is not available in this case. *See, e.g.*, U.S.S.G. § 5B1.1; 21 U.S.C. § 841(b).

### D. The Guidelines and the Guidelines Range

The applicable Guidelines range, after affording the benefits of the plea agreement, is outlined above. One of the purposes of the Sentencing Commission and Guidelines effort is to "assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2)," 28 U.S.C. §§ 991(b)(1)(A), 994(f); *Rita*, 551 U.S. at 348-50, and "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives," *Rita*, 551 U.S. at 350. The Guidelines range for supervised release is five years to life. U.S.S.G. §§ 5D1.2(a), (c). The Guidelines range for a fine is from $20,000 to $11,000,000. U.S.S.G. §§ 5E1.2(c)(2)-(4).

The United States recommends a sentence essentially at the bottom of the ultimate advisory Guidelines range, consistently with the agreed-upon range under Rule 11(c)(1)(C) and for the reasons described above. Notably, the Guidelines range would have been the same even for a single non-fatal overdose, because of the guns, and contains no addition for drug weight at all, *e.g.*—and the Guidelines range itself would have been life if Evans had been subjected to the additional statutory minimum penalties. Accordingly, in other circumstances even an upward departure or other variance from the advisory Guidelines might be appropriate—and avoiding that risk was also a benefit to Evans through the plea agreement in this case.

14

The United States recommends a period of supervised release of six years, slightly higher than the minimum given the lengthy period of conduct here, and no fine.

E.  **Sentencing Commission Policy Statements**

Other than as discussed elsewhere in this memorandum, the United States has not identified any specific "pertinent policy statements" applicable here.

F.  **The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

Imposition of a sentence of imprisonment of between 360 and 372 months also will appropriately serve "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6)—although this factor is admittedly difficult to appraise due to the unprecedented number of overdoses joined in this case. Giles received a sentence of imprisonment of 25 years, based on these same overdoses but taking into consideration other unique and significant considerations—which are absent here—that were discussed with the Court in that case.

Before Giles's sentencing, in double-overdose death cases over the past several years, the Court imposed sentences of 22 years (Tyler Clements), 15 years (Danielle Orndorff), and 14 years (Thomas Breeden). In contrast to Evans's case, both Clements and Breeden, in particular, were cooperative, each of these three only had relatively minor to no criminal history, and here there are three times as many overdoses. As an example of Evans's conduct, in a recorded jail call, Evans is heard reporting to his girlfriend that he refused to identify specific people they both knew, when shown photographs of them by federal law enforcement—thus both exhibiting his refusal to cooperate with law enforcement and working to alert those individuals of law enforcement's interest.

Non-fatal overdoses have received sentences of 12, 14, and 15 years, as examples, with

15

additional time up to 17 years for, for example, Pennington who had a gun charge as well—and these cases, again, often only involved single non-fatal overdoses, such as Dean Roberson's 15-year sentence for a Baltimore-origin heroin charge and a broader methamphetamine conspiracy. Other sentences have been lower, such as Stephanie Alkire's and Donna Jenkins's for the non-fatal overdose of B.D.W. on this partnership's heroin, or Brandy Kelly for the single fatal overdose of R.F.L. (all of them 9 years or less)—but those cases captured only a fraction of the harm that is at issue here and shorter periods of time. Scott Pierce received a sentence of 17.5 years for the single fatal overdose of R.F.L. For a different single fatal overdose, Dennis Getz received a sentence of 18.5 years' imprisonment, and Brandi Marple, his co-defendant, 9.5 years. For all of those defendants, for example, the drug weight was much less, and length of time distributing was much less, the criminal history was less, there were additional mitigating factors both before and after these defendants' arrests, and the impact of their criminal conduct—through the number of overdoses and otherwise—was much less.

As relevant to possible mitigation, Evans was not as close to the specific overdose victims as these defendants were, and Clements's case had such aggravating circumstances as distribution in a rehabilitation facility, for instance—but the differences in volume of drugs, number of overdoses, and criminal history here are staggering. Evans knew people were overdosing on the heroin they sold and he kept selling heroin and other drugs, which he himself packaged and "cooked" (and specifically procured, with respect to the cocaine). He interacted with the customers over time, handled money and drugs in the transactions, and arranged transactions—and the fact that the knowledge of overdoses did not change his continuing drug distribution heightens the need for a sentence such as that recommended in this case. Although Giles spoke to the customers more on the phone than Evans did and was closer to them in that

16

way, Evans saw the customers daily in person and his criminal history and active, specific involvement in packaging, housing, and handling the drugs make his conduct aggravated in different ways than Giles's.

Evans's accumulation of guns, which Evans acknowledged he received in trade for drugs and did "for protection of his and Giles's drugs and money" (Statement of Facts, at 2), also heightens the government's concern—and is another distinction from Giles.

At the same time, the United States is seeking to take into account Evans's acceptance of responsibility through his guilty plea—and Evans is receiving extensive benefits by way of the plea agreement itself on that basis.

Accordingly, the United States is seeking to pursue a congruent sentence here. The recommended sentence attempts to reflect Evans's criminal history and the aggravating factors in terms of the deaths and the need for supervision and otherwise. By imposing such a reasonable sentence based upon Evans's criminal conduct, history, and the circumstances here, the Court will increase the likelihood that it is imposing a sentence similar to those being imposed by other district courts upon similarly situated defendants who have committed the same crimes.

### G. The Need to Provide Restitution to Any Victim(s) of the Offense

Restitution is not legally applicable in this case. 18 U.S.C. § 3663(a)(1)(A).

### H. Forfeiture

The United States is not pursuing any forfeiture as to Evans.

## III. Sentencing Exhibits

The United States does not intend to introduce any exhibits during the sentencing hearing in this case, although it will have a copy of the jail call transcript (referenced above) and other transcripts available, if needed. The United States anticipates that a letter from the spouse of

R.F.L. will be read to the Court.  Although the United States is not aware of any other specific victim-related information that may be presented, individuals exposed to the overdoses may attend the sentencing hearing.

## IV. Sentencing Witnesses

The United States does not intend to present the testimony of any witnesses during the sentencing hearing in this case.  The case was investigated by the Northwest Virginia Regional Drug and Gang Task Force and the Drug Enforcement Administration.

## CONCLUSION

Taking all of the factors into account, the United States respectfully submits that a sentence of imprisonment of between 360 and 372 months will be appropriate and warranted in this case, and recommends such a sentence.

> Respectfully submitted,
>
> JOHN P. FISHWICK, JR.
> United States Attorney
>
> s/ Elizabeth G. Wright
> Special Assistant United States Attorney
> VSB No. 71576
> United States Attorney's Office
> 116 North Main Street, Ste. 130
> Harrisonburg, Virginia 22802
> Tel.: (540) 432-6636
> *elizabeth.wright2@usdoj.gov*

CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2016, I caused the foregoing Sentencing Memorandum of the United States to be electronically filed through this Court's CM/ECF system, which will send notification of such filing to all parties.

s/ Elizabeth G. Wright
Special Assistant United States Attorney