```
 1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF VIRGINIA
 2                  Harrisonburg Division

 3  UNITED STATES OF AMERICA,          Criminal No. 5:15cr00020

 4
                    Plaintiff,
 5
            vs.                        Harrisonburg, Virginia
 6
    WARREN EVANS, JR.,
 7
                    Defendant.         January 27, 2016
 8

 9         TRANSCRIPT OF EXCERPT OF GUILTY PLEA HEARING
             BEFORE THE HONORABLE MICHAEL F. URBANSKI
10                 UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the United States:      ERIN KULPA
                                U.S. Attorney's Office
13                              255 W. Main St.  Room 130
                                Charlottesville, VA 22902
14
    For the Defendant:          RUSSELL DARREN BOSTIC, ESQ.
15                              Bostic & Bostic
                                409 Virginia Ave.
16                              Harrisonburg VA 22802

17  Court Reporter:             Sonia Ferris, RPR, OCR
                                U.S. Court Reporter
18                              116 N. Main St.  Room 314
                                Harrisonburg, VA 22802
19                              540.434.3181.  Ext. 7

20

21

22

23

24

25  Proceedings recorded by mechanical stenography; transcript
    produced by computer.
```

1          MS. KULPA:  Yes, Your Honor.  Thank you.

2          So specifically, in regard to Count 1 with the drug

3     trafficking conspiracy -- and as you mentioned, Your Honor,

4     you had Mr. Giles before you.  There is a period of time from

5     February 2013 to October 2014 where Mr. Evans and Mr. Giles

6     worked together.  Essentially, they had a pretty structured

7     division of labor, from the information that we have; that

8     essentially Mr. Giles was the source of the contacts for

9     heroin distribution and Mr. Evans brought to the table the

10    contacts for cocaine distribution and they used those

11    contacts to distribute together heroin, cocaine and crack

12    cocaine during the course of the conspiracy.

13         They specifically targeted customers in and around

14    the Winchester, Virginia, area and a lot of the connections

15    between Mr. Giles and Mr. Evans go back to distributors in

16    Virginia and West Virginia, in the Winchester area

17    specifically, that were distributing crack cocaine and heroin

18    to customers in those regions.

19         There are phone records that connect a lot of these

20    pieces of the puzzle together, as Your Honor can see, and

21    much of the witnesses and the information that we had

22    indicated that when Mr. Giles and Mr. Evans were together,

23    they were essentially dividing labor, even on the individual

24    drug deal.  So not at a macro level, Your Honor, but at a

25    micro level.  They would appear together to distribute the

drugs. One would handle money and the other would handle the

drugs. One would be driving and the other would be in the

passenger seat. There were undercover purchases that law

enforcement has on video and that was given in discovery that

showed Mr. Evans clearly being one of the individuals. Mr.

Giles was the one that had taken the call and made the

connection to arrange for the purchase and the transaction.

Mr. Evans is the one who was actually doing the distribution

hand-to-hand, with Mr. Giles in the car. So when we say they

worked quite closely together as partners, Your Honor, they

truly did, both at a macro level where, as you can see from

the search warrants that were executed in May 2014, you had

essentially the bulk of the cash discovered at a residence

primarily occupied by Mr. Giles, and then the drugs and the

guns, Your Honor, were kept at a residence primarily occupied

by Mr. Evans. Three of those firearms that were recovered --

of the three that were recovered during that search warrant,

two of those firearms, Your Honor, were linked to a

transaction that Mr. Evans made, essentially trading drugs

for those guns, and were connected to Virginia and West

Virginia distributors that were selling drugs to customers

throughout the Virginia and West Virginia area. So, Your

Honor, both at a macro level and at a micro level, there

really was that division of labor in what they were doing.

There was discussion among Mr. Giles and Mr. Evans

1    about the overdose deaths of individuals that were happening.

2    They were learning of the overdose deaths as they were coming

3    up.  And Your Honor, while the count of the indictment

4    charges Mr. Evans with the distribution death to RFL, as

5    you'll note in the statement of facts that you reviewed,

6    there were other individuals, both overdose deaths and

7    serious bodily injuries, that were attributable to both Mr.

8    Giles and Mr. Evans and they were aware of these deaths

9    during the time they were happening and continuing to

10   distribute heroin to the same distributors and -- that were

11   then taking it back and selling it to the customers in that

12   area.

13       Your Honor, specifically as to the overdose death

14   that occurred with RFL, there was a lot of phone records and

15   information that went back and forth between Mr. Giles and

16   the distributor in the Winchester area, who was Scott Pierce,

17   and who had travelled from Winchester to Baltimore on

18   multiple occasions to purchase heroin and crack cocaine from

19   Mr. Giles; and that Mr. Evans was with Mr. Giles at least

20   half the time when this particular distribution on March 19,

21   2014, on that specific date, Mr. Giles was there -- excuse

22   me, Your Honor.  Mr. Evans was there with Mr. Giles while the

23   transaction was happening and while they were distributing,

24   he purchased three grams of heroin on that occasion. He

25   brought it back, distributed it in three separate bags of

1    heroin which had come from Mr. Giles and Evans -- Mr. Evans,

2    and the distribution happened to RFL that same day, Your

3    Honor.

4         So, there's a pretty direct link to this specific

5    distribution and to the death of RFL; so this specific

6    distribution by Mr. Evans and the death of RFL, specifically

7    as is charged in Count 2.

8         Your Honor, going through some of the other overdose

9    injuries, you'll see that the facts are there in terms of how

10   the distribution happened, how those amounts that were coming

11   from Mr. Evans and Mr. Giles ultimately wound up in the hands

12   of the individuals who distributed it and who used it and

13   overdosed.

14        So, I'm happy to go over anything else more

15   specifically, but I do know in speaking with Mr. Bostic that

16   Mr. Evans had read this in detail; had asked questions

17   specifically; had multiple meetings to address this.  So I do

18   know that his signature on this was based on him reviewing

19   this in detail, but I'm happy to highlight anything else,

20   Your Honor.

21        THE COURT:  Can we talk about drug weight for a

22   minute? Where's the evidence in this case that the drug

23   weight of 1,000 grams of heroin -- at least 1,000 grams of

24   heroin -- at least 280 grams of crack cocaine was reasonably

25   foreseeable to Mr. Evans? Where does that come from?

1    MS. KULPA:  Your Honor, in the description of the

2    partnership between Mr. Evans and Mr. Giles, both the

3    information that came from Mr. Giles and the information that

4    came from Mr. Evans, they talked about working together on

5    this from its inception, and that they were really in a

6    partnership.  So the weight that is attributable is over the

7    course of the entire conspiracy, from February 2013 through

8    October 2014.  There was not much independent action going on

9    by either one of these individuals at that time.  So, while

10   sources may have -- sources of supply may have belonged as

11   connections, personal connections to one or the other, they

12   really worked in partnership in order to engage in this

13   distribution conspiracy.  So the weight is attributable to

14   both of them.

15        I can't stress enough to Your Honor that both at a

16   macro level and a micro level, they were not only dividing up

17   sources and contacts, but to the extent when Mr. Giles would

18   go out of town, Mr. Evans ran the entire distribution

19   business, while Mr. Giles would be out of town on vacation.

20   He was in charge of all the contacts, all of the buys that

21   were being made from them that weekend, regardless of the

22   substance, and responsible for the money. The money would be

23   pooled, stored at one location.  The drugs would be pooled,

24   stored at one location.

25        Just as a snapshot, Your Honor, on the one occasion

1    that law enforcement executed the search warrant, on that

2    discreet day, at the home of Mr. Evans where he was residing,

3    there was $4000 in cash, 93 grams of powder cocaine, ten

4    grams of heroin and three firearms.  Those three firearms had

5    specifically been traded for drugs that were part of the

6    conspiracy.  So we know that those are directly related to

7    this conspiracy.

8            Then, at the same time at Mr. Giles' home, there was

9    $60,000 in cash, 12 grams of crack, even though -- so as you

10   can see, Your Honor, Mr. Evans is holding the heroin,

11   although Mr. Giles is the one with the heroin connections.

12   Mr. Giles is holding the crack, although Mr. Evans is the one

13   with the crack supply connections.  That's because they

14   really just worked in partnership about where they were going

15   to store things, how they were going to do a division of

16   labor in order to be as profitable and as efficient as

17   possible, Your Honor.

18           THE COURT:  Thank you for that, Ms. Kulpa.

19           Mr. Bostic, based on your review of this case, your

20   review of the discovery, your understanding of this case, do

21   you have any dispute with what Ms. Kulpa just went over?

22           MR. BOSTIC:  Judge, the one thing I would

23   characterize a little bit differently than she characterized

24   it, Mr. Evans' involvement of it, I do not believe, was in

25   going out and actually getting the majority of the drugs.

1   That was mostly Mr. Giles.  He had a number of different

2   connections of people that he was buying from.  What Mr.

3   Evans did with respect to the cocaine, did have a source

4   there.  But the heroin, the vast majority of that was Mr.

5   Giles.  I believe that Mr. Giles would even state that.

6           With respect to the weight, in dealing with that, one

7   of the things I always try to do is develop in my mind, not

8   just through people's testimony, but actually go through and

9   look in what individual purchases were going on. As police

10  were starting the investigation and starting to put together

11  individual statements of different people involved, they, a

12  lot of times, will do a brief proffer.  I was able to satisfy

13  myself the government could prove their standard.  There was

14  a number of witnesses that would describe the weights as

15  going up that they were actually buying from Mr. Giles and

16  Mr. Evans, of course, was right there in the car the vast

17  majority of those times.  Weights, quite frankly, add up

18  quite quickly.

19          THE COURT:  Weights in excess of a thousand grams of

20  heroin?

21          MR. BOSTIC:  Yes.

22          THE COURT:  And in excess of 280 grams of crack?

23          MR. BOSTIC:  Yes.

24          In fact, I think the grand jury testimony of a number

25  of different people easily gets above that.

1      THE COURT:  What about with regard to his involvement

2  with the heroin on the day that the heroin is provided to Mr.

3  Pierce that led to the overdose death of RFL? Are you

4  satisfied there's sufficient evidence there?

5      MR. BOSTIC:  Yeah.

6      Let me also state, I have done some research on this

7  on heroin overdose cases. There have been a variety of

8  different circuits and what the requirement is and whether or

9  not there's a requirement under the Pinkerton liability.  Or

10  does there have to be a direct line going up?  Depending on

11  which jurisdiction, you get kind of a different version.

12      The one thing about this particular death, I was able

13  to satisfy myself to a specific direct line up to Giles and

14  Mr. Evans, I believe, was there on that particular

15  distribution.  So it was a little bit unusual in that regard

16  that there was a direct line.

17      The Pinkerton liability was the first thing I

18  actually started off with.  That was my very first concern.

19  Then I started looking at a lot of other jurisdictions and I

20  found that there was some record to support this direct line

21  theory.  Where we are is I believe they could prove that.

22      THE COURT:  Now, did you go over this agreed

23  statement of facts with your client?

24      MR. BOSTIC:  Yes.

25      THE COURT:  Did you have a chance to go over it in

```
 1    detail and make any necessary changes and corrections to it?
 2             MR. BOSTIC:  Yes.
 3             THE COURT:  Now, Mr. Evans, let me ask you. You've
 4    heard what the government said and you've heard what
 5    Mr. Bostic said.  Do you disagree with any of that?
 6             THE DEFENDANT:  No, sir.
 7             THE COURT:  Did you, in fact, engage in distribution
 8    of heroin and crack cocaine?
 9             THE DEFENDANT:  Yes, sir.
10             THE COURT:  With Mr. Giles?
11             THE DEFENDANT:  Yes, sir.
12             THE COURT:  Was it reasonably foreseeable to you that
13    the amount involved was more than a thousand grams of heroin
14    throughout the entire scope of the conspiracy?
15             THE DEFENDANT:  Yes, sir.
16             THE COURT:  And the same question with regard to
17    280 grams of crack cocaine throughout the entire scope?
18             THE DEFENDANT:  Yes, sir.
19             THE COURT:  Did you and Mr. Giles know that folks
20    were overdosing?
21             THE DEFENDANT:  I just learned when this right here
22    happened, during the course.
23             THE COURT:  I'm not sure I understand what you mean.
24             THE DEFENDANT:  I found out with this, in this
25    discovery and everything, what was going on.
```

1   　　　　THE COURT: Well, did you know at the time you were

2   selling the drugs folks were overdosing?

3   　　　　THE DEFENDANT: No. I heard they would like

4   overdose, but they would come back and things like that.

5   　　　　THE COURT: Did you know anybody died?

6   　　　　THE DEFENDANT: No, I didn't know nobody died until

7   my lawyer told me.

8   　　　　THE COURT: Do you have any reason to disagree or

9   dispute the government's evidence that you were present with

10  Mr. Giles when the heroin that was sold to Mr. Pierce ended

11  up in the hands of RFL when he died? Do you have any basis

12  upon which to dispute that?

13  　　　　THE DEFENDANT: No, sir.

14  　　　　THE COURT: Did you go over this written statement of

15  facts?

16  　　　　THE DEFENDANT: Yes, sir.

17  　　　　THE COURT: Did you go over it with your lawyer?

18  　　　　THE DEFENDANT: Yes, sir.

19  　　　　THE COURT: Is what's set forth in this written

20  statement of facts accurate?

21  　　　　THE DEFENDANT: Yes, sir.

22  　　　　THE COURT: Do you agree with it?

23  　　　　THE DEFENDANT: Yes, sir.

24  　　　　THE COURT: Are you, in fact, guilty of conspiracy to

25  distribute, an illegal agreement to distribute a thousand

```
1    grams or more of heroin?

2            THE DEFENDANT:  Yes, sir.

3            THE COURT:  Are you, in fact, guilty of a conspiracy,

4    an illegal agreement, to distribute 280 grams or more of

5    crack cocaine?

6            THE DEFENDANT:  Yes, sir.

7            THE COURT:  Are you, in fact, guilty of the charge in

8    Count 2 of distributing heroin that resulted in the death of

9    RFL?

10           THE DEFENDANT:  Yes, sir.

11           THE COURT:  Are you pleading guilty of your own free

12   will?

13           THE DEFENDANT:  Yes, sir.

14           (Conclusion of requested excerpt).

15

16   "I certify that the foregoing is a correct transcript from

17   the record of proceedings in the above-entitled matter.

18

19

20   /s/ Sonia Ferris                    June 13, 2016"

21

22

23

24

25
```