1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF VIRGINIA
2               Harrisonburg Division

3    UNITED STATES OF AMERICA          Criminal No. 5:15cr00020

4
                    Plaintiff,
5
            vs.                        Harrisonburg, Virginia
6
     WARREN EVANS, JR.,
7
                    Defendant.          June 15, 2016
8

9          TRANSCRIPT OF SENTENCING HEARING
         BEFORE THE HONORABLE MICHAEL F. URBANSKI
10             UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the United States:      ELIZABETH WRIGHT
                                 U.S. Attorney's Office
13                               116 N. Main St.  Room 130
                                 Harrisonburg, VA 22802
14
     For the Defendant:         RUSSELL DARREN BOSTIC, ESQ.
15                              Bostic & Bostic
                                409 Virginia Ave.
16                              Harrisonburg VA 22802

17   Court Reporter:           Sonia Ferris, RPR, OCR
                               U.S. Court Reporter
18                             116 N. Main St.  Room 314
                               Harrisonburg, VA 22802
19                             540.434.3181.  Ext. 7

20

21

22

23

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

1    THE COURT:  Good morning.
2    Please call the case.

3    THE CLERK:  Yes, Your Honor.

4    This is Criminal Action No. 5:15-cr-00020, United
5    States of America vs. Warren Evans, Jr.

6    THE COURT:  All right.  Good morning, Ms. Wright.

7    Good morning, Mr. Bostic.

8    MR. BOSTIC:  Good morning.

9    THE COURT:  This case has been set down today for
10   sentencing.

11   Is the United States ready to proceed?

12   MS. WRIGHT:  Yes, Your Honor.

13   THE COURT:  Is the defendant ready to proceed?

14   MR. BOSTIC:  Yes, sir.

15   THE COURT:  Okay.  Let me ask you, Mr. Evans, do you
16   remain fully satisfied with the advice and representation
17   provided by your lawyer, Mr. Bostic, in this case?

18   THE DEFENDANT:  Yes, sir.

19   THE COURT:  Okay.  All right.  This case -- let's
20   just recap where we are.

21   This case is proceeding on a guilty plea and that is
22   pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal
23   Procedure.  The guilty plea -- we had a change-of-plea
24   hearing on January the 27th as to Counts 1 and 2 of the
25   indictment.  Count 1 charged conspiracy to possess with the

```
1   intent to distribute a thousand grams or more of heroin;

2   conspiracy to possess with the intent to distribute 280 grams

3   or more of crack cocaine; conspiracy to possess with the

4   intent to distribute cocaine.  And then Count 2 charged

5   conspiracy to distribute heroin, the use of which resulted in

6   the serious bodily injury and death of RFL.

7           Those are the two counts in the indictment.

8           There's a written plea agreement in this case, as I

9   said, under Rule 11(c)(1)(C).

10          I conducted the plea hearing on January 27th; found

11  the defendant competent and found his plea to be knowing and

12  voluntary, but I took under advisement the acceptance of the

13  plea and plea hearing pending receipt of the presentence

14  investigation report, which I have read.

15          So let me just make sure that everybody still wants

16  to go forward with this.

17          Is the government still interested in going forward

18  today with the sentencing pursuant to the plea agreement?

19          MS. WRIGHT:  Yes, we are, Your Honor.

20          THE COURT:  Okay.  Mr. Bostic, is your client

21  interested in going forward with the sentencing in this

22  case --

23          MR. BOSTIC:  Yes, sir.

24          THE COURT:  -- and staying true to the plea agreement

25  in this case?
```

```
 1              MR. BOSTIC:  Yes.

 2              THE COURT:  All right.  Let me ask you, Mr. Evans:

 3    Do you want the Court to accept the plea agreement in this

 4    case?

 5              THE DEFENDANT:  Yes, sir.

 6              THE COURT:  Okay.  You understand that if I accept

 7    the plea agreement in this case, under Rule 11(c)(1)(C) of

 8    the Federal Rules of Criminal Procedure, I must sentence you

 9    to a period of incarceration between 282 and 372 months in

10    the Bureau of Prisons.  Do you understand that?

11              THE DEFENDANT:  Yes, sir.

12              THE COURT:  Okay.  And that's the result of your

13    plea.  Do you understand that?

14              THE DEFENDANT:  Yes, sir.

15              THE COURT:  All right.  There -- I did not see any

16    objections to the presentence report that were filed.

17              Does the government have any additional objections or

18    issues with regard to the PSR you want to state at this time,

19    Ms. Wright?

20              MS. WRIGHT:  Just one.  Thank you, Your Honor.

21              We do have a proposed edit.  In the sentence in

22    paragraph nine of the PSR that I proposed -- Mr. Bostic

23    agrees to it and "probation" is also fine with this edit.

24              In reviewing a transcript of a segment -- well, I

25    guess I'll back up a little.
```

1         So this sentence was added between the original PSR

2    and the revised PSR, so the government did not see this until

3    it received this revised PSR.  And then upon reviewing the

4    transcript of that segment of the hearing, we just wanted to

5    propose the tiny wording tweaked in there for clarity we

6    think would better capture that transcript and that's to

7    delete the three words --

8         THE COURT:  This is in paragraph nine?

9         MS. WRIGHT:  Paragraph nine, Your Honor, in the last

10   sentence.

11        THE COURT:  All right.

12        MS. WRIGHT:  It begins, "lastly."

13        THE COURT:  Uh-huh.

14        MS. WRIGHT:  To delete the three words, "in general

15   terms," in that sentence.  So it would just reflect, "He

16   stated at his change-of-plea hearing that he was aware of the

17   overdoses, but was not aware of specific instances where the

18   overdoses resulted in death."

19        We think that more accurately captures the statements

20   at the plea hearing; and, again, Mr. Bostic and probation are

21   fine with that proposed change.

22        THE COURT:  All right.  And how do you propose we

23   deal with that?  We go ahead and make the change before the

24   PSR is filed?

25        MR. TAYLOR:  Yes, Your Honor.

1       THE COURT:  Okay.  Mr. Bostic, any objection to that?

2       MR. BOSTIC:  No objections.  Judge, I actually did

3  review the transcript and that is an accurate statement of

4  what was actually said.

5       THE COURT:  I noted that the transcript had been

6  ordered and I went back and reviewed that portion of the

7  transcript before this morning's hearing as well.

8       All right.  Do you have any other objections,

9  Mr. Bostic, with regard to the -- with regard to the PSR in

10  this case?

11       MR. BOSTIC:  No, Judge.  I did speak to Mr. Taylor

12  concerning several different things when I saw the very first

13  version; that actually being one of them, was that particular

14  sentence.  But we have no other objections.

15       THE COURT:  So with making that change to paragraph

16  nine, are both parties agreed that the PSR is acceptable and

17  non-objectionable?

18       Ms. Wright?

19       MS. WRIGHT:  Yes, Your Honor.

20       THE COURT:  Mr. Bostic?

21       MR. BOSTIC:  Yes.

22       THE COURT:  Okay.  I will accept the PSR as amended

23  with that amended change in paragraph nine to delete the

24  words, "in general terms."  All right.

25       Let's go ahead and go over the penalties in this

1    case.

2         The counts -- Count 1A and B, those are the portions

3    of the -- of Count 1 which deal with the thousand grams of

4    heroin, the 280 grams of crack cocaine.  Each have a 10-year

5    mandatory minimum under the statute.  The -- Count C, which

6    just charged conspiracy with possession -- possession with

7    the intent to distribute cocaine, that's a 0-to-20 charge.

8         Count 2, of course, the conspiracy to distribute

9    heroin resulting in death or serious bodily injury of RFL has

10   a 20-year mandatory minimum.

11        So those are the statutory penalties.

12        The maximum under Count 1A is life; maximum under

13   Count 1B is life; and Count 1C is 20 years; and, of course,

14   under Count 4, it's life as well.

15        There's a period of supervised release under

16   Counts 1A and B of at least five years, and under Count 1C

17   and Count 2 of at least three years.  There is a mandatory

18   special assessment for each of these counts at $100.

19        Let me go ahead and -- consistent with the probation

20   officer's recommended guidelines findings -- make my

21   guidelines findings in this case.

22        The base offense level under 2D1.1(a)(2) is a 38.

23   And that's a guideline based on the death or serious bodily

24   injury.  There's a two-point enhancement under the guidelines

25   for the possession of a firearm, and that is under

1    2D1.1(b)(1).

2            And I just want to -- I was at a -- I was at a

3    seminar last week put on by the Sentencing Commission and I

4    was informed -- and I wasn't aware of this before -- that the

5    Bureau of Prisons, if there is a -- if there is a two-point

6    enhancement for having a firearm in a drug case, they are not

7    going to classify the defendant as being eligible for RDAP.

8    He can receive drug treatment, but he's not going to get the

9    time off for the residential drug treatment program.  They

10   just -- anyone who's got that two-point enhancement under

11   2D1.1(b)(1), the Bureau of Prisons, in its discretion, does

12   not classify anyone eligible for RDAP who has that two-point

13   gun enhancement.  Okay?  I just want to let you all know

14   that.

15           Were you aware of that, Mr. Bostic?

16           MR. BOSTIC:  Yes, I was, Judge.

17           And if I can address that, one of the things that I

18   did actually put in my sentencing memorandum was that

19   although the guns were there and there was a trade of the

20   drugs for the guns and the guns were present at the time the

21   search warrant was conducted, there is no evidence that I

22   have seen indicating that Mr. Evans ever brandished or ever

23   used the guns in the distribution.  There was nobody injured

24   as a result of being shot.  And that was one of the things

25   that I wanted to actually ask the Court, when the Court does

1    enter the final sentencing, to actually put in there that it

2    does not appear that there was anything in Mr. Evans' history

3    indicating he was violent, so.

4          I -- and, of course, I'm looking at it, I realize

5    with a sentencing range that we're looking at of this length,

6    I don't know what changes will occur between now and --

7          THE COURT:  Boy, isn't that the truth?  You know, we

8    don't know what's going to happen.

9          So you want me to put somewhere in the Statement of

10    Reasons a finding that even though there is this gun

11    enhancement, there was no evidence that he brandished the

12    firearm or was violent?

13          MR. BOSTIC:  Correct.

14          THE COURT:  Let me ask the United States their

15    position on that.

16          MS. WRIGHT:  Thank you, Your Honor.

17          I don't object to that.  I would note just for

18    clarity that -- I mean, the fact of the gun-for-drug swaps

19    does support the charge under 924(c) -- and I think that may

20    have been the distinction Mr. Bostic was getting at with the

21    clarification that the guns weren't brandished, but sort of

22    say it wasn't a 924(c), but the case law is clear that when a

23    gun is traded for drugs, it does violate 924(c).

24          THE COURT:  It's that opinion which talked about use.

25          MS. WRIGHT:  Yes, Your Honor.

1          THE COURT:  Yeah.

2          MS. WRIGHT:  But I don't object, I mean, to the part

3     about it not being violent, and I don't object on principle

4     that there isn't evidence that the firearms were brandished.

5     We do not have any evidence to present on that.  I just

6     wanted to clarify that -- I mean, to the extent it's arguing

7     with anything about the 924(c), I think that's incorrect; but

8     factually, it is.

9          THE COURT:  Okay.  I mean, this is all through -- I

10    mean, this is all within the bailiwick of the Bureau of

11    Prisons.  Okay.  I can put in here to make sure the record is

12    clear so that they have the information, because they look at

13    all this information.  They look at the PSR, they look at the

14    judgment, they look at the Statement of Reasons.  I don't

15    think they look at the transcript unless there's some

16    particular reason for doing it.

17         So I can put in the Statement of Reasons that

18    although this enhancement was appropriate, there's no

19    evidence that the -- that during the drug transactions, a gun

20    was brandished or that the defendant engaged in violence.

21         Is that okay with you, Ms. Wright?

22         MS. WRIGHT:  It is, Your Honor.

23         MR. BOSTIC:  I think that satisfies what my goals --

24         THE COURT:  All right.  I'll put that in the

25    Statement of Reasons.

Okay. Now, there's a -- this defendant would be, as reflected in paragraph 26 of the PSR, a career offender because he's got so many prior felony drug convictions, but we're not employing the career offender guideline in this case because the guideline for death or serious bodily injury is greater and you apply the greater guideline. So we have a base offense level of 38, plus two for the gun. And then you have the three-level reduction under -- for acceptance of responsibility.

I assume the government is moving for the third point.

MS. WRIGHT: Yes, we are, Your Honor. Mr. Evans did sign his guilty plea in an acceptable time.

THE COURT: All right. So we have a total offense level of 37 in this case.

Mr. Evans has five prior felony drug convictions in Baltimore and 16 criminal history points. He was under a criminal justice sentence at the time of his -- at the time of the offense in this case. He has been a career drug dealer.

And so, with a criminal history score of 18 -- that's 16 plus two -- it puts him in criminal history category VI. Of course, he would be if he was a career offender anyway. And that puts his guidelines at 30 years to life. 360 months to life. That would be 37 and VI. Yeah. Which, of course,

```
1   is the next-to-highest range that you can get on the

2   sentencing table; the only higher range being the guideline

3   of life.  This is 360 to life.  Thirty years to life.

4           Okay.  All right.  Any objection to the Court's

5   guidelines calculations with regard to offense level, with

6   regard to criminal history category or the guidelines range?

7           Ms. Wright?

8           MS. WRIGHT:  No objections, Your Honor.

9           Although, we did count that there were six prior

10  felony drug convictions.  I think the one that may have

11  seemed to be on the fence from the PSR was in paragraph 33.

12  I'm not sure if that's the one that --

13          THE COURT:  Well, that's why I put he -- I meant to

14  say he's at least five.

15          MS. WRIGHT:  Okay.  Yes.  At least five years.

16          THE COURT:  At least five, right?

17          MS. WRIGHT:  Yes.  That's fine, Your Honor.

18          THE COURT:  There was -- there was one -- there was

19  some question about -- he has at least five.

20          I mean, the point is it's not lost on anyone in this

21  room, but for the government filing 851s in this case, this

22  gentleman's sentence would be mandatory life.  I mean, that's

23  just the way it is because he's got so many prior drug

24  convictions.  And the benefit of this plea agreement from

25  Mr. Evans' perspective is he's not being faced with mandatory
```

```
 1    life.  I mean, the sentence here is big.  Everybody knows

 2    that.  It's, you know, 282 to 372, but it's not mandatory

 3    life.  And that's the benefit of this plea agreement for

 4    Mr. Evans.

 5            And I know, Mr. Evans, that's not lost on you,

 6    correct?

 7            THE DEFENDANT:  Sir?

 8            THE COURT:  You understand that?

 9            THE DEFENDANT:  Yes, sir.

10            THE COURT:  Yes.  Okay.  All right.

11            Any objection to the guidelines calculations from

12    your standpoint, Mr. Bostic?

13            MR. BOSTIC:  No, sir.

14            THE COURT:  Okay.

15            MR. BOSTIC:  Judge, I would note one -- just kind of

16    a weird thing.

17            THE COURT:  Yeah.

18            MR. BOSTIC:  Several of the drug convictions I

19    noticed when I was actually going through the record actually

20    are listed as misdemeanors under Maryland law, with maximum

21    punishments of four years, which is a really weird thing.

22    I've never seen that before.  I was actually looking at the

23    law and downloading the specific cases from the courts.

24            THE COURT:  The specific convictions?

25            MR. BOSTIC:  The specific convictions; yes, sir.  And
```

1  it actually had them listed -- I think it was from maybe two

2  of them.  It qualifies under the U.S. Code as felonies.  It

3  was just kind of a weird anomaly.

4          THE COURT:  Well, it qualifies because it's

5  punishable by more than one year.  But in Maryland, they

6  were -- you say they're characterized as misdemeanors.

7          MR. BOSTIC:  Yeah, it -- I had never seen anything

8  like that before.  But they were --

9          THE COURT:  Do you have anything you want to say

10 about that, Mr. Taylor?

11         MR. TAYLOR:  He's absolutely correct.  Maryland

12 does -- their state system is an absolute mess.  I don't know

13 what in the world they're thinking, but they have

14 misdemeanors that are four, five, six, seven years.  It's --

15 you can't take it on face value.

16         THE COURT:  Okay.  Well, I mean, what we have to look

17 at is the -- not what Maryland calls it but what -- under

18 federal law what the penalty is and whether it's more than

19 one year that it qualifies as a --

20         MR. BOSTIC:  And that's why there's no objection to

21 that.

22         THE COURT:  I appreciate that, Mr. Bostic.

23         All right.  I've read your sentencing memorandum,

24 both parties' sentencing memorandum, and I appreciate the

25 thought and care you've put into those.  Obviously, this is a

1    very serious case as -- in terms of the underlying facts

2    involved in -- I think the other gentleman's name was Gill;

3    is that right?

4         MS. WRIGHT:  Giles, Your Honor.

5         THE COURT:  Giles, Giles'.  Right.  Christopher Giles

6    and Mr. Evans' involvement in bringing all of these drugs

7    down to this area from Baltimore resulting in, as best I can

8    determine, six overdoses, three involving death and three

9    nonfatal overdoses.

10        I know the defendant is asking for a variance below

11   the guidelines, and I want to hear what you have to say,

12   Mr. Bostic.

13        First, let me ask the United States, do you have any

14   evidence you want to put on?

15        MS. WRIGHT:  No, Your Honor.

16        THE COURT:  Okay.  Do you have any evidence you want

17   to put on, Mr. Bostic?

18        MR. BOSTIC:  Judge, I actually thought about calling

19   Ms. Evans.  She is on her way but is not present yet, so.

20        THE COURT:  Well, if she gets here and we still --

21   we're still going, I'll be happy to hear what she has to say.

22   Thank you for that.

23        MR. BOSTIC:  I just want to make the Court aware, she

24   was at least going to be here today.

25        THE COURT:  She was trying to be here?

1        MR. BOSTIC:  Yes.

2        THE COURT:  But you haven't seen her yet?

3        MR. BOSTIC:  I have not.

4        THE COURT:  Okay.  Let's --

5        MR. BOSTIC:  No evidence beyond that.

6        THE COURT:  Yeah.

7        Let's ask the clerk to check with the CSOs downstairs

8 and let us know if Ms. Evans arrives in the building.

9        One thing I want to do, therefore, is accept the plea

10 and the plea agreement under Rule 11(c)(1)(C).  I find it is

11 well grounded in the facts.  It's -- it is -- the plea is

12 amply supported as to each of the elements of the offense

13 under the facts.  The defendant's competent.  He is fully

14 advised of the terms of the plea and the plea agreement and I

15 accept the plea and plea agreement.

16        So we're in the issue now of under the (C) plea of

17 where in the range, 282 to 372, we should sentence Mr. Evans.

18        The defendant asks for a variance below the

19 guidelines of 360 months.  I want to hear from the defendant

20 on that.

21        The other thing I want to hear from the government on

22 is this:  You know, this is an interesting case in which

23 Mr. Giles -- as I understand it, Mr. Giles and Mr. Evans were

24 in this partnership and they came down here -- and I don't

25 use that term "partnership" in any formal sense.  They came

down here from Baltimore together and they sold heroin and
they sold crack cocaine together.  But Mr. Evans was more on
the crack cocaine side and Mr. Giles was more on the heroin
side.  But this is a conspiracy.

        And so what I want to hear from the government on,
when I hear from the government, is, specifically, Mr. Evans'
role vis-a-vis these overdoses, okay?  Because that's what
ramps up this penalty; the overdoses.  And if the overdoses
were more resulting from the heroin side as opposed to the
crack cocaine side, where should the Court fashion an
appropriate penalty for Mr. Evans in this case?  Okay?

        So, Mr. Bostic, let's hear what you have to say as
regards to your application for a variance.

        MR. BOSTIC:  Judge, a lot of this actually isn't --
I'd planned as part of the closing argument, so there will be
some overlap.  A couple different things, Judge.

        Mr. Evans currently is, I believe --

        THE COURT:  Well, we can do all that together if you
want.  I mean, this is -- this is your opportunity to ask for
a variance and to tell me whatever it is under the 3553(a)
factor as to why this sentence should be where you're asking
for.  And then we'll give Ms. Wright a chance to respond.

        MR. BOSTIC:  Yes.

        Judge, it -- I guess I'll kind of prepare this and go
along because I'd set it up as a sentencing argument

specifically.

THE COURT:  Well, do you want Ms. Wright to go first?
I'm happy to do that.  I mean, it --

MR. BOSTIC:  If she can.

THE COURT:  Let's do that.

MR. BOSTIC:  If you prefer.

THE COURT:  Ms. Wright, you want to go first and then
we'll hear from Mr. Bostic and then I'll give you a chance to
respond.

MS. WRIGHT:  Okay.  Sure, Your Honor.

And I'll give a few points to address the Court's
specific question first to make sure I do that and then I'll
jump into some of my other general sentencing argument
points.

This was a partnership in the full sense of the word.
Mr. Giles had the heroin sources of supply.  Mr. Evans did
have more of the cocaine sources of supply that were
arranged.  So that was sort of the distinction between
Mr. Giles being slightly more on the heroin side.

But once the two of them got the drugs, they were
pooling the money to get the drugs.  They were splitting the
money from all of these sales.  And the real profitable part
of this enterprise was from these heroin sales; these massive
sales that the pair were engaging in.  They were together all
the time, driving around.  Mr. Evans was in the car actively

passing along the drugs, I mean, including -- all the time,

this heroin and handling the money.

THE COURT:  Including handling the heroin?

MS. WRIGHT:  Yes, yes.  And he was storing all of the

drugs -- Mr. Evans was storing all of the drugs, including

all the heroin, at his residence.  The way they had arranged

it, Mr. Giles was sort of keeping the money.  Mr. Evans was

keeping the heroin and all the other drugs.  So he had all

the drugs at his residence.  That was part of the division of

labor they had.  So once the drugs were in their possession,

there really was no distinction.

Mr. Giles was more often involved on the phone

talking to these residents, but whenever he was unavailable,

Mr. Evans would pick it up.  And Mr. Evans also regularly

talked to them and talked to them when they were there

driving up from Winchester and being present with them.  So

we admit that Mr. Giles was more sort of the public face in

this enterprise.  He was "Charlie"; he was the name that

folks knew, but these two men were inseparable.

And the fact of Mr. Evans storing the drugs,

packaging the drugs and having this really active role in the

conspiracy we think is -- made him a full partner both for

the heroin and for the cocaine side.

I'd also note that in terms of the mandatory

penalties, Mr. Evans would be subject to a mandatory penalty

1   of life with the 851s, even for the crack cocaine with the

2   weight that they had.  So it isn't just that the mandatory

3   penalties come into play at all with -- I mean, from the

4   heroin side; they are present on the cocaine side as well.

5           The other --

6           THE COURT:  You're asking the Court to sentence

7   Mr. Evans to a sentence that is longer than Mr. Giles'

8   sentence, right?

9           MS. WRIGHT:  Yes, Your Honor.

10          THE COURT:  Mr. Giles got 300 months custody under a

11  Rule 11(c)(1)(C) plea and you're asking, as I understand it,

12  in your sentencing memo, for 360 months; correct?

13          MS. WRIGHT:  360 to 372.

14          THE COURT:  Right.

15          MS. WRIGHT:  Yes, Your Honor.

16          THE COURT:  Tell me why the Court should, in terms of

17  the 3553(a) factor of avoiding unwarranted sentencing

18  disparities, why the Court should consider giving a different

19  sentence to Mr. Giles than Mr. Evans.

20          MS. WRIGHT:  That is because, Your Honor, Mr. Evans

21  lacks the unique circumstances that were discussed in detail

22  with the Court at Mr. Giles' sentencing hearing in the sealed

23  sentencing memorandum of the defendant and in the proceeding

24  under seal.

25          That's the short answer to that question.

1      And separately from that, sort of after that, there

2  are a variety of factors about Mr. Evans' conduct that are

3  distinctly more aggravating, in the government's mind, than

4  Mr. Giles' conduct. Mr. Evans was the one who was

5  accumulating guns. He admitted that he was doing this

6  specifically to protect the partnership's drugs and money.

7      Mr. Evans has, I mean, three times as many of these

8  serious prior drug convictions as Mr. Giles had. He has a

9  more aggravated criminal history overall distinctly.

10  Mr. Giles only had two prior felony drug convictions.

11  Mr. Giles also was in a criminal history category of five

12  before application of the career offender guideline, whereas

13  Mr. Evans gets to that -- with the criminal history category,

14  it's already in a VI even before, so there's really no bump

15  for Mr. Evans at all from the career offender guideline

16  whatsoever.

17      Mr. Evans, I mean, is more than ten years older than

18  Mr. Giles, had a longer period of time, engaged in all this

19  conduct, and was, like Mr. Giles, on a period of supervision

20  throughout this conduct, resumed it promptly after the

21  May 2014 searches and arrests of both of them. And this was

22  despite his more serious criminal history, these many

23  additional chances to have a second chance to turn things

24  around and not to continue to engage in this conduct.

25      As the PSR notes, Mr. Evans was fully supporting

himself through this financial partnership, through these

drug sales; the predominant majority of which were heroin.

So this was --

THE COURT:  Can I ask you to go back on one point?

MS. WRIGHT:  Of course, Your Honor.

THE COURT:  And I think we covered this at the guilty

plea, but I want to make sure that I'm clear on this.

You talked a minute ago about Mr. Evans being on

supervision and just -- and not stopping and he was fully

aware of his conduct.  What evidence is there that Mr. Evans

knew of -- and this goes to paragraph nine of the PSR, too,

knew of these overdose circumstances and continued to sell

drugs?

MS. WRIGHT:  It is described in the Statement of

Facts that even for this first overdose death of TRC in

November 2013, Mr. Giles was fully informed and he

communicated everything to Mr. Evans.  So the government had

distinct evidence in this case of that -- of Mr. Giles

knowing about these deaths including, specifically, that TRC

died in November 20, 2013 and that Mr. Evans knew that, too.

And that there were discussions of that repeatedly.

In the hearing as well, even in the plea, in

Mr. Evans' statements at the plea hearing, he acknowledges

being aware that there were overdoses.  He said that some

people then -- he saw them again, so they weren't overdose

1   deaths.  But it's also true that legally, under the law -- I

2   mean, first, there's no foreseeability requirement at all for

3   these overdoses under the law in the Fourth Circuit; but

4   also, there isn't a legal distinction here between the

5   serious bodily injury overdoses and the death overdoses.

6        Because heroin is such a dangerous drug, if people

7   are overdosing, there's such a high risk of death here that

8   we don't really distinguish between the knowledge.  If he

9   knew people were overdosing and surviving, that's a major

10  concern to us, too, even if he didn't know people had

11  specifically died.  But in this case, in any event, there was

12  evidence he knew that people died; and specifically, that TRC

13  died in November 2013 before any of these other overdoses and

14  that he was fully in the loop on all the communications that

15  --

16        THE COURT:  RFL didn't pass away until March 19th,

17  2014.

18        MS. WRIGHT:  Correct, Your Honor.

19        THE COURT:  So even after this first death, they keep

20  selling.  There's more overdoses and more deaths; is that

21  fair?

22        MS. WRIGHT:  That's very fair, Your Honor.

23        So that is precisely the heightened government

24  concern in this case.

25        And when Mr. Giles -- I mean, the role he had with

1    the -- I mean, his personality and having more of the direct

2    communications with these sub-distributors, I mean, his

3    starting point would have been higher than Mr. Evans, but

4    then he had the major factors that we discussed under seal.

5    So that's really the key difference.  And then those are the

6    main other factors that just make it of significant concern

7    of Mr. Evans' conduct.  Because the evidence certainly showed

8    he was continuing to do this despite the overdoses, despite

9    these deaths and knowing about them, and that's obviously a

10   tremendous concern.

11          And it -- tying into sort of the general sentencing

12   argument, I mean, that's why we are asking for the high end

13   of the range within the plea agreement.  It's actually the

14   bottom of the guideline range and a guideline range that's

15   already held lower and eliminates mandatory penalties both

16   through overdoses, heroin and crack cocaine and had no

17   charges under 924(c).  So there are massive benefits to

18   Mr. Evans simply from the guilty plea in this case.  And we

19   respect and appreciate that acceptance of responsibility, the

20   acceptance of responsibility in the Statement of Facts and

21   acknowledging all of these overdoses, but we don't think

22   there's any factor here that counsels for a lower sentence

23   than the top of this range in the agreed-upon plea agreement

24   range.

25          This Court has been seeing the tragedy and havoc of

these heroin overdoses now for years; sadly, has heard from
victims in the past.  And I believe there's one victim letter
to be read today as well of the family members who lost their
wives, their daughters, their granddaughters and whose lives
were irreparably changed based on the success of this
particular partnership and how well run this partnership was
between Mr. Evans and Mr. Giles.  And that was only enabled
by Mr. Evans -- I mean, the division of labor they had that
kept up the efficiency, the packaging, and there being this
one-stop shop where the three drugs were available.  That
distinguished this partnership from other drug dealers that
people could go to who might just have heroin.  That was part
of what made them uniquely attractive and kept them as really
the dominant sellers to the northern part of this district
for such a lengthy period of time.

        So the sentence in this case really needs to reflect
the tragedy underlying this case through these overdoses and
the length of time of this conduct, the vast weight of
drugs -- I mean, the weights sort of doesn't cause any
additional bump in the over -- sort of the overdoses involved
either; but here, we do have significant weight and a really
profit-driven enterprise that needs to be taken into account
and reflected.  And we think it can only appropriately be
reflected at the top end of this range.

        And we also have sort of serious concerns about

1 protecting the community here from Mr. Evans, given his

2 repeated returns to this behavior over -- I mean, to drug

3 behavior over 20 years.

4 As the Court noted, he really is sort of making a

5 career of this, and it was a career that was killing people

6 and that kept on killing people. So we think that the

7 sentence that we're asking for is fully justified, and any

8 lower sentences really wouldn't capture the full scope of

9 this conduct. It wasn't addiction driven here; it was money

10 driven. It was preying on the communities in the northern

11 part of the district. And we really need a sentence at this

12 level in order to reflect the full scope of conduct, the harm

13 that it caused and to serve all the other purposes of

14 sentencing and really do justice in this case.

15 THE COURT: Thank you, Ms. Wright.

16 Mr. Bostic?

17 MR. BOSTIC: Judge, there's no question, Mr. Evans --

18 and one of the most difficult things about this case for me,

19 I usually have a variety of different things I can really

20 point to; and, really, the basic fact is Mr. Evans has been a

21 career drug dealer.

22 THE COURT: Well, you point out in your sentencing

23 memo, though, even though he has all these drug felonies and

24 all these drug convictions, he's only spent a total of around

25 four years to date in custody.

1    MR. BOSTIC:  And, actually, where I had kind of

2    outlined my closing argument was to simply point out that

3    Maryland is a different world, when it comes to sentencing,

4    from anyplace I've ever practiced.  And I've practiced both

5    in North Carolina and I've been in a variety of different

6    jurisdictions in Virginia, and I've never seen anything like

7    the type of sentences or the lack of any real sentencing in

8    Maryland.  And I've had a variety of clients over the years.

9    Mr. Evans is, obviously, the most recent, where in Baltimore,

10   particularly Baltimore, where heroin is extremely prevalent,

11   it is just treated totally differently than it is in federal

12   court or in Virginia state court.  That is a fact when -- and

13   I'll be perfectly frank about this.  The very first time I

14   met with Mr. Evans and I sat down and I said, You're looking

15   at mandatory life here.  And it was one of the most shocking

16   looks I have ever received on anybody's face.  It -- he

17   had -- with everything that has gone on in Maryland, the

18   highest sentence he had ever gotten was on a probation

19   revocation, which was a four-year sentence.

20        So the possible ramifications just never occurred to

21   him because that is the way -- you know, from the time he

22   was, basically, a young man up until now, he had never faced

23   those ramifications; and it was a shocker.  And the look on

24   his face was quite stunning, to be honest with you.  It was

25   really something he had never faced and never heard of.

1    One thing we have already pointed out -- and the

2    reason I'm asking the Court to go down to that 23-and-a-half

3    years, Mr. Giles got 25 years.  And I would ask the Court to

4    sentence right where Mr. Giles is.

5    And a couple different things.  When it is --

6    Mr. Giles described the drugs as he would go get the heroin.

7    Really, the heroin distribution was his gig at the beginning,

8    totally.  He was the one that had all the connections.  He

9    had all the connections as far as acquisition of the heroin.

10   He also had all of the people he would distribute to.  All of

11   the phone calls, all of that was originally set up by

12   Mr. Giles.  Mr. Evans basically came in and joined that.  But

13   it was still all throughout the time frame of this

14   conspiracy.

15   Mr. Giles was probably 95 percent, to 90 percent

16   at -- bare minimum, the person getting all the heroin and

17   making all the phone calls and setting up all the deals.

18   Mr. Evans was present when those occurred.

19   And we're not in any way arguing that it minimizes

20   his role in the conspiracy, because certainly, as far as

21   packaging and much of that part of it, he was involved.  But

22   an awful lot of it was Mr. Giles with the acquisition and

23   with having all the connections.

24   And, really, when I -- when it comes down to it,

25   Mr. Giles is currently -- excuse me.  Mr. Evans is currently

1    39 years old.  And I'm looking at what is -- taking

2    everything into account and also looking at what are the

3    recidivism rates for people once they hit 50 and then once

4    they hit 60.  And if the Court gives Mr. Evans 23-and-a-half

5    years, he's going to be -- or, even 25 years, he's going to

6    be up in the 60s.  Earliest he'll be getting out is in his

7    60s.  At that point, of course, he is going to be looking at

8    a period of supervised release and is going to be required to

9    do everything that a probation officer requires him to do.

10          To me, when looking at the overall picture, what is

11   the real difference between a sentence of 25 years and

12   30 years?  What's the real difference?  Does that really have

13   any effect on any of the requirements for an adequate

14   deterrence?  A 25-year sentence certainly has the same effect

15   as a 30-year sentence.  There really is no difference.

16   Protect the public from future crimes.  We're looking at that

17   five-year range.  All of the studies show at 60, the

18   recidivism rates go down dramatically.  At 50, they go down

19   dramatically.

20          Educational and vocational training, really, all of

21   that can be done in, certainly, 25 years.  That extra five

22   years is really not going to make any difference.  The only

23   real difference it is going to make is Mr. Evans would at

24   least be young enough to where he can get out and actually

25   have somewhat of a productive remainder of his life.  In any

1   way you look at it, over 60, we're looking at 25 years.

2          Now, I think sometimes it does get lost because we

3   throw a lot of numbers around of -- think about where I was

4   25 years ago, where you were 25 years ago.  Twenty-five years

5   ago, I was just beginning to practice law in Virginia.  I had

6   hair.  It has been a very, very long time frame.

7          In speaking to Mr. Evans, one of the things, and I

8   think when you're in the game the way he was in the game, and

9   particularly, smoking as much pot as he was doing -- and I

10  actually alluded to it in my sentencing memorandum -- that

11  it -- he found out, and his mom was later diagnosed as

12  bipolar.  And in speaking with him, one of the things that we

13  talked about was he smoked a lot of pot.  He felt like he was

14  on edge all the time.

15         And I think the way people that are in that game view

16  it and the business aspects of it, they're not thinking in

17  the ramifications of the way we think of things in an

18  anesthetized environment.  When we're in a courtroom, we have

19  very specific language we use, we have a very specific way of

20  looking at things.  People that are out there, and

21  particularly people like Mr. Evans and Mr. Giles, that

22  basically become career drug dealers, they think about things

23  very differently.

24         The Court is -- at the end of this, the Court is

25  going to give a very, very dramatically long sentence.  What

we're asking the Court to do, taking into account all the

factors set forth in 3553 and also taking into account what

is an appropriate sentence, given what Mr. Giles received?  I

think the fact that Mr. Giles -- and I don't know everything

about what was under seal, but I'm familiar with some --

what -- in dealing with Mr. Giles, a lot of his sentence is

offset.  I think his sentence would have been longer were it

not for those factors, but the one thing that Mr. Giles was,

when we're dealing with these ODs and dealing with the

deaths, he was a person that was doing all the acquisition,

making the phone calls and actually was setting up the deals.

And I think those two somewhat offset.

        The one last thing I would like to say very much for

Mr. Evans, even though he was in that game and had been in

that game for in excess of 20 years, he never got into the

point of being violent.  And violence, as all the case law

basically -- I'm sure we could probably find 100 cases that

say guns and drugs go together.  Violence goes right along

with it.  No violent acts whatsoever.  No brandishings.  No

threats of violence.  And I think there's a certain kind of

weird aspect of it.  I think that should go to his credit,

that he never got to that point of doing things to get

violent or to be violent.

        Judge, in closing, I would ask the Court, I think

that sentence in that 23-and-a-half to 25-year range is going

1    to accomplish all the goals that need to be accomplished.

2    Adding an extra five years or adding an extra eight years, I

3    really don't think is accomplishing anything.  I don't think

4    it accomplishes anything under the guidelines and the way the

5    statute is set up under 3553.

6          I would ask the Court to give a sentence in that

7    range.

8          THE COURT:  Thank you, Mr. Bostic.

9          Mr. Taylor, Mr. Bostic asked me earlier to put a

10   reference in the Statement of Reasons of -- to the extent

11   that there was no evidence that a gun was brandished or the

12   defendant engaged in violence.  Is that consistent with your

13   investigation in this case?

14         MR. TAYLOR:  It is, Your Honor.

15         THE COURT:  Okay.  I just wanted to get your input on

16   that.

17         All right.  Did you want to say anything else,

18   Ms. Wright?

19         MS. WRIGHT:  If I may, just a couple of points

20   responding to that.

21         Thank you, Your Honor.

22         THE COURT:  And, Mr. Bostic, I'll give you a chance

23   to respond as well to anything Ms. Wright wants to say.

24         MR. BOSTIC:  Yes, sir.

25         MS. WRIGHT:  Thank you, Your Honor.

So I wanted to just note, I think, three sort of

responses to Mr. Bostic.  I mean, the first one is just to

emphasize that this really was a role that was more than

presence.  This was constant presence in the car, handing

over the drugs.  We have photographs and I brought one in

case there was other evidence presented of -- I mean, showing

Mr. Evans handing the drugs out the car window that was in a

controlled purchase.  So this was not sort of in the

passenger seat, doing nothing, chitchatting or driving

around.  This a full partnership in storing the drugs,

packaging the drugs, being present and handling the drugs and

money for all of these transactions.  This wasn't passive at

all.  Even though Mr. Giles was doing the additional

communicating, making the phone calls and had the heroin

connects himself to bring the drugs in, I mean, that was

parallel to Mr. Evans handling all the cocaine connections.

So this was sort of pooling the drugs and money and making

this a stronger partnership that contributed to it being so

productive and so destructive over this period of time.

I'll also note that the fact of the Baltimore Court

sentencing was the same background that this Court looked at

with Mr. Giles.  Mr. Giles had a much less criminal history

than Mr. Evans, but he had the same experience in Baltimore

courts giving these low sentences, not serving all these

sentences that were imposed and the same shock at and

```
1    learning what -- I mean, in having to internalize what the
2    federal penalties were.  So that was the same situation in
3    context --
4          THE COURT:  Well, I --
5          MS. WRIGHT:  -- that he was coming from.
6          THE COURT:  I recall the Giles sentencing, and I
7    recall the issue that I raised at the Giles sentencing and
8    that was:  Is the agreed-upon sentence sufficient?  That's
9    what I asked.  That's what -- that's what I raised an issue
10   of.  Was the sentence that the parties agreed to in that
11   Rule 11(c)(1)(C) plea, was that enough?
12         MS. WRIGHT:  Yes.  Understood, Your Honor.
13         THE COURT:  And based on the information that I
14   received specific to that case, I determined it was
15   sufficient.  But my concern there going into the Christopher
16   Giles sentencing was that maybe 300 months was too low.
17         MS. WRIGHT:  Understood, Your Honor.  And we had
18   anticipated that concern as well and that's why we gave
19   the -- sort of the detailed presentation under seal and
20   really were talking about the truly unique and significant
21   factors in that case that the government was trying to give
22   reflection to; and again, those factors aren't here in this
23   case.
24         THE COURT:  I mean, this --
25         MS. WRIGHT:  And --
```

```
 1          THE COURT:  We're talking about six overdoses; six

 2    overdoses these folks are responsible for over a long period

 3    of time.  And the thing that really -- that is a red flag for

 4    me is these folks were doing it for money.  They carried

 5    firearms and they came down here and continued to sell

 6    this -- these drugs into this community, knowing that it had

 7    killed someone and that it was causing people to overdose.

 8    They just kept at it.  The only thing that has kept them from

 9    doing this is that they were arrested.

10          MS. WRIGHT:  Yes, Your Honor.  And the only times

11    that -- from its history, it looks like Mr. Evans hasn't been

12    engaged in the drug distribution.  This dangerous drug

13    distribution has been when he's been in jail.

14          It's absolutely correct, too, that on the overdoses,

15    this case is unspeakably tragic and an unprecedented number

16    of overdoses linked to this partnership.  So the behavior is,

17    I mean, at best, sort of callous in a way that this Court

18    really hasn't otherwise seen and is truly damaging to our

19    communities.

20          The last point that I just make, I mention in my

21    sentencing memo, the government mentioned, there was -- I

22    mean, the fact of a jail call, that Mr. Evans did not

23    cooperate with the government in this case; and, in fact, we

24    had a jail call that reflected that he was shown photographs

25    by law enforcement.  He recognized many of them and he called
```

his girlfriend and asked her, in code, to warn them and
specifically, to tell them that they were being looked at by
law enforcement.  We didn't do anything to pursue
potential -- any obstruction enhancement or any other --
anything else on that, but it does sort of capture, I think,
a lack of repentance in this case.  That was in September of
2015.  And doing things even at that stage when -- I mean, he
knew what he was charged with.  He knew -- I mean, at the
least -- I mean, we think throughout this -- the evidence is
clear that throughout this, he knew what was happening.  But
even then, he was still trying to help out other folks who
were engaged in this conduct.  So that does really give great
concern.  And, again, we think any sentence less than the 30
to 31 years does not reflect the overdoses here, the
long-going and dangerous nature of this conduct or Mr. Evans'
history.

      THE COURT:  All right.  Did you want -- let's hear
from Mr. Bostic anything he would like to respond to.  Then I
think you had some victim statement you wanted to read.

      MS. WRIGHT:  I believe one letter, Your Honor, yes.

      THE COURT:  Mr. Bostic?

      MR. BOSTIC:  Judge, the -- at the beginning when
that -- and I actually was advised that there was this phone
call that Mr. Evans had made to his wife.  We actually had
gone over and he was shown some pictures.  When I was reading

through it, I did not -- the way I read it was not as much, you know, go tell everybody not -- you know, to shut down or blah, blah, blah. It was more along the lines of, you know, the feds know who these people are, was more the way I was reading that. The phone call was very disjointed, trying to listen to it.

But in any event, I think it -- in the end, -- one thing I did kind of want to point out. We were talking about Mr. Giles going to get the heroin. In an awful lot of that, he was doing it almost on a daily basis. It was not a daily basis. It was certainly every other day. So when we talk about, you know, Mr. Evans storing drugs, it was really what was -- what Mr. Giles would go get, come back, package and then was going out that day. So an awful lot of that, Mr. Giles was the one that was responsible for that acquisition and was basically setting up everything. And Mr. Evans was involved with that packaging aspect of it. He was present. And there's no question he is -- he is certainly part of the conspiracy. But as far as the heroin side of it, that was very much Mr. Giles' involvement in that.

I just did want to make that clarification.

THE COURT: Thank you for that, Mr. Bostic.

All right. Did you want to present the statement from the victim?

MS. WRIGHT: Yes. Thank you, Your Honor.

1          This is a letter from the husband of RFL, who could

2     not be present.  And the Court will have heard it at

3     Mr. Giles' sentencing as well.

4          THE COURT:  All right.

5          MS. WRIGHT:  But he could not be present due to his

6     health issues.  And we contacted, for instance, family

7     members of TRC and they were unable to come.  I think they

8     have ongoing health issues, too.

9          THE COURT:  Okay.  Thank you.

10         MS. COX:  "Good day to everyone.  Thank you, Mr.

11    Prosecutor, Your Honor before this Court and especially to

12    DEA agents who took it upon themselves to specifically get to

13    the bottom of this situation that has took place over the

14    past two years.

15         "I've wanted to appear today before all of you to not

16    cause any more problems for the defendant, but to show my

17    gratitude and love for my wife who sadly lost her life

18    because of this evil drug, on March 20th, 2014.

19         "To begin with, I'm no saint myself.  I have done a

20    lot of dirt in my life and I owe it to my wife to say

21    something on her behalf.  Not here to wish or say anything

22    bad about the defendant, but he knew eventually someone would

23    lose their life because of this drug.  That's the only

24    problem I have with any of this case.  He had to know it was

25    going to happen eventually with him putting his stuff on the

1   street.  And, of course, the money was the evil root of the

2   whole situation.

3        "This whole thing has changed my life forever.  It

4   has taken my wife, my lover, my soulmate away from me

5   forever.  RFL was the most beautiful person I have ever met

6   in my life.  I spent the first half of my life trying to find

7   that soulmate in life and it finally happened with meeting

8   her.

9        "I'm disabled because of some health issues I have.

10  And she was more than my wife, my best friend, my caregiver,

11  and took care of me 24 hours a day when I couldn't do it for

12  myself.

13       "When we first met, she had a real bad car accident

14  that left both femur bones in her leg sticking out of her

15  leg.  The doctors had to put her on pain pills.  And I'm sure

16  the courts have heard the situation before with people having

17  legitimate pain and when they're at the end of their

18  recovery, the doctors had to take her off the meds she was

19  taking, and she was stuck with addiction when that happened.

20       "It all started with buying pills to replace that,

21  and they got expensive and she turned to the next best thing

22  to her and that was the devil's drug, heroin.

23       "Again, I'm not here to wish this gentleman receive a

24  sentence that would take the rest of his life away, but I

25  forgive you, sir, and a sentence that you -- would give you

1  the opportunity to have a life after incarceration, to live

2  life the right way.

3       "I know money is the root of all evil.  It messes a

4  lot of people's lives up.  You knew when you chose to

5  distribute this drug, a day may happen like this when your

6  freedom is taken away from you.  So please, sir, take it upon

7  yourself to maybe go the right way one time in life and see

8  how good it can be without the drug game and the money behind

9  it.

10      "Once again, thank you for the time to speak today.

11  I wanted to specifically thank the DEA agents for their

12  wholehearted effort with this.  To Agent Hickey, I

13  specifically thank you from the bottom of my heart with your

14  effort to keep me informed with everything that has happened

15  over the past two years.  I'm sure my wife is today finally

16  breathing a sigh of relief for every effort you had displayed

17  to her and myself.

18      "I love RFL.  Please rest in peace now and I -- and

19  I'll see you in the future."

20      THE COURT:  Thank you.

21      All right.  Mr. Evans, we've heard from the lawyers.

22  We've heard their argument.  We have received the -- into

23  evidence the victim statement that was just read.

24      What would you like to say, sir, by way of allocution

25  that might be helpful to the Court in fashioning an

appropriate sentence in this case?  What would you like to

tell me, sir?  If you have something you want to read, you

can come to the podium.  We'll be happy to hear from you.

THE DEFENDANT:  Your Honor, thank you for this

opportunity to speak to you today.  I want to begin by

accepting responsibility for the event that brought me to

this moment in my life.  I apologize for having troubled the

Court.  I also wish to apologize to the family and the

community as well.

It is my hope that as you sentence me today that you

provide me a mechanism, as well as a path to redemption, to

help me improve myself and begin to contribute and provide

and serve in benefit to others and to remain in the life of

my children.  I can assure the Court that such events that

have led to this day will not happen again.

I love my wife and children and wish to return to

their lives as quickly as possible.  I would apologize to the

courts.  Continue to support the welfare of my children once

more again.

I take full responsibility for what I have done and I

thank the courts for hearing me today.  Thank you.

I apologize to your family and the victims that lost

their lives.

THE COURT:  Thank you, Mr. Evans.

If you would go back to counsel table and remain

1    standing.

2         All right.  You know, Mr. Evans, you know, I -- I

3    heard what you had to say and I really have two comments with

4    regard to that.  You asked me to provide you with a path and

5    mechanism for redemption.  Okay.  Well, the Bureau of Prisons

6    can provide some assistance in terms of vocational training,

7    counseling, education.  But that path of redemption has got

8    to start with you.  Okay?

9         THE DEFENDANT:  Yes, sir.

10        THE COURT:  And your statement goes to that.  Okay.

11   That path of redemption has got to start on that day.  Want

12   to change from your history of drug dealing, that's what

13   you've done in your life, that's got to start right here.

14   It's got to start inside you.  Okay?  And your statement here

15   today, which I found to be candid and thoughtful and

16   heartfelt, is a start.  Okay?  It's a start.

17        And, you know what -- the second comment I want to

18   make on that allocution is when you looked over at the folks

19   on that side of the room and apologized to the families of

20   the victims, you know, I believe that you were sincere in

21   that.  I don't think you ever intended for anybody to die

22   from these overdoses or to suffer overdoses and serious

23   health consequences.  I don't think you did.  I think that is

24   an unfortunate result of the conduct that you engaged in, but

25   I don't think you intended that.

1    The thing that's really troubling about your conduct,

2  obviously, is that you were aware of overdoses, you were

3  aware of a death, yet you kept selling drugs for the money.

4  And that's really the real message here and that is folks who

5  distribute these substances that result in the kind of

6  overdoses and deaths that we have seen in this community and

7  in this nation, the message needs to be loud and clear that

8  that is not tolerated and that that will be punished to the

9  full extent of the law.

10    It is -- you know, I would feel differently about

11  this case had Warren Evans realized that there were overdoses

12  out there and changed his behavior.  But you didn't.  You

13  kept at it.  You kept selling, knowing that people were being

14  hurt.  And that really puts this case in as egregious a case

15  as this Court ever sees.

16    So we have the -- we have the six overdoses, three of

17  which are fatal.  We have your conspiracy and involvement

18  with Mr. Giles who I gave him -- that was a (C) plea of 288

19  to 300 months in that case, and I gave him the 300 months.

20  I, frankly, went into that hearing, but for the evidence that

21  I heard under seal in that case, I would have -- I mean, I

22  went into that hearing thinking that 300 months was not

23  enough, given the terrible toll that the conduct that you

24  engaged in and Mr. Giles engaged in had on this community.

25  It is as bad as it gets in terms of -- in terms of the price

1    -- the price that these folks paid for your conduct.  And

2    that was a conduct simply as a way to make money, an easy way

3    to make money.

4         You know -- and Mr. Bostic makes a good argument to

5    point out what he can in your case and that is that there was

6    no suggestion that you were involved in violence.  Well,

7    that's about the only -- that's about the only good thing he

8    can say about this conduct.  There's six overdoses.  Lots of

9    lives are ruined.  The ripple effects of these overdoses are

10   -- they will continue for years and years to the lives of the

11   family members of the people who died and the people who

12   suffer from this addiction.  This conduct is your effort to

13   make money preying on the addiction and the destruction and

14   the path of destruction that these drugs cause.

15        And this isn't, in your case, an isolated

16   circumstance.  You had many prior drug distribution

17   convictions.  You simply were put through a state system that

18   chose to punish these kinds of offenses in a far less way

19   than the federal system does.  There's a mandatory minimum

20   penalty in this case of 20 years.  You all have agreed to a

21   sentence range that -- of 282 to 372 months in this case.

22        You engaged, in your life, in a lifetime of drug

23   dealing.  You were involved with guns.  Even though there was

24   no violence associated with it in terms of the association

25   with those guns, there certainly could have been.  And -- but

1     there's a different kind of violence in this case and that

2     violence is the violence that happens inside of a person when

3     they take those drugs that you were dealing; three of whom

4     are dead, three of them suffered overdoses.

5         You know, the government argues in its sentencing

6     memorandum that given your history, there's limited potential

7     for rehabilitation here.  And I get that and I understand

8     that.

9         The defendant argues fairly effectively, I think,

10     that a limiting factor on the sentence ought to be your age.

11     You're 39 years old already.  And to give you the kind of

12     sentence that the government asks for in this case, you know,

13     puts you out at -- without considering good time, puts you

14     out, you know, 30 plus years from now.  Puts you in your --

15     certainly in your 60s.  And, you know, I understand that

16     argument and I've thought about that argument.  And I believe

17     on balance in this case, when you consider the factors of

18     deterrence, okay, what's going to -- what has kept or what's

19     -- what is keeping Mr. Evans from engaging in drug dealing?

20     Well, the only thing that has kept him from engaging in drug

21     dealing is being put in prison.  So for deterrence and

22     protection of the public, this crime calls for a serious

23     sentence, a sentence that will do the only thing that I know

24     that we can do to keep you from engaging in drug dealing, and

25     that is put you away, because you've got all these prior

convictions.  You were -- you received these other sentences
and you just kept at it.  Even the death of a person at your
hands, at the hands of this conspiracy, didn't keep you from
continuing this drug dealing.  So for protection of public
and deterrence, both to you and general deterrence, the
sentence needs to be at a serious range.

Of course, you know, I'm not kidding myself.  Any
sentence in this 288 -- 282 to 372 range is serious.  It's
all a long time.  It's all -- it's all a huge portion of your
life.  I understand that.

Protection of the public; deterrence; the need for
the sentence imposed to reflect the seriousness of the
offense.  Obviously, it doesn't get any more serious than
people dying as a result of drug dealing.

To promote respect for the law.  Well, you've shown
an absolutely abject disrespect for the law.  You've been
convicted over and over and over of drug dealing; and yet,
you have continued doing it.  To provide just punishment.

You know, on balance, considering all these factors
I'm required to impose a sentence that is sufficient but not
greater than necessary.  Frankly, but for the aspect of the
Giles' case that caused me to sentence Mr. Giles to the upper
end of the Rule 11(c)(1)(C) range, that was provided to the
Court under seal, I see no reason to vary from the guidelines
in this case.  The guidelines are 360 to life.  They take

into account your criminal history.  They take into account

the nature of this crime.  I see no reason to vary from the

guidelines.  And, in fact, I'm going to sentence you to

372 months, which is the top end of the Rule 11(c)(1)(C)

range.

          This crime, with this number of overdoses, with your

continuing your conduct after being aware of the overdoses,

with your criminal history, with your involvement with guns,

leaves me no choice but to sentence you to 372 months.  I'm

going to sentence you to that, under Count 1 and Count 2, to

run concurrent.

          I'm going to impose a $1,000 fine in this case.  The

payment schedule is $25 a month, to commence 60 days

hereafter or 50 percent of your BOP earnings, whichever is

greater.

          I'm imposing a fine in this case -- even though your

financial ability is limited, I'm imposing a fine because I

do believe it will assist you in getting UNICOR and

vocational priority in the Bureau of Prisons.

          There's no restitution; two hundred dollar mandatory

special assessment; five years of supervised release.

          Now, the defendant asked me a couple of other things.

The defendant asked me to run this sentence concurrent with

any pending Maryland state charges that he will receive a

sentence from.  And I'm not going to do that.  I'm not going

to -- I'm not going to take out of the hands of the Baltimore

state judges their ability to sentence for the crimes that

took place there. I think they will have the ability of

knowing what this Court did. They will have the ability of

knowing that this Court sentenced you to 372 months in the

Bureau of Prisons. And if they decide they want to run that

sentence concurrent, I'll let those state judges do it. But

I'm not going to presume to pass judgment on a crime done in

Baltimore. That is the responsibility of a Maryland state

judge to run the sentence concurrent with charges that

Mr. Evans has not yet been sentenced to. I leave that to the

judgment of the Maryland state judges. And they certainly

will have the benefit of knowing that I sentenced Mr. Evans

to a very, very long time in prison.

        And, you know, I'm mindful of how long this sentence

is. I am. But the sentence that these folks who got these

overdoses and who died is even longer.

        All right. I'm going to put you on five years

supervised release. You must report to probation in the

district to which you're released within 72 hours of release

from the custody of the Bureau of Prisons.

        You are to comply with the following mandatory

conditions of supervision. You shall not commit another

federal, state or local crime. You cannot unlawfully possess

a controlled substance. You cannot buy, sell, use a

controlled substance. I'm going to require -- and that includes marijuana. I'm going to require drug testing.

Cannot buy, sell, possess, use a firearm, ammunition, destructive device or dangerous weapon. You may not live in a home where there are any.

I'm going to require you to cooperate in the collection of DNA.

I'm going to require that you comply with the mandatory -- or, the standard conditions of supervision and that is a thousand-dollar fine, two-hundred dollar mandatory special assessment, along with the payment schedule that I've imposed.

We're going to wait and see -- following release from incarceration, we'll evaluate your status to see whether additional drug rehabilitation is necessary and appropriate. If additional rehabilitation is deemed appropriate, you shall participate in a program that is designated by the Court upon consultation of probation until such time as you've satisfied the requirements of the program.

You shall be subject to warrantless search and seizure to ensure compliance with these conditions. You've waived your right to appeal your sentence. That waiver is binding unless the sentence exceeds the statutory maximum or is based on a constitutionally impermissible factor. If you undertake to appeal despite your waiver, you may lose the

1    benefits of your plea agreement.

2         If a right of appeal does exist, a person who is

3    unable to pay the cost of appeal may apply for leave to

4    appeal without prepayment of such cost.  Any notice of appeal

5    must be filed within 14 days of the entry of judgment or

6    14 days of a notice of appeal by the government.  If

7    requested, the clerk will prepare and file a notice of appeal

8    on behalf of the defendant.

9         Mr. Bostic, do you have any request for a location?

10         MR. BOSTIC:  Cumberland, Maryland.

11         THE COURT:  I'm going to -- what I'm going to do is I

12    am going to ask the judgment reflect that Mr. Evans be

13    sentenced to the closest Bureau of Prisons facility to his

14    home that suits his security classification and that he

15    specifically requests Cumberland, Maryland.

16         THE DEFENDANT:  Thank you.

17         THE COURT:  I'll also request that he receive

18    whatever drug treatment the Bureau of Prisons can provide him

19    and any vocational training that is appropriate.

20         Anything further from the government in this case?

21         MS. WRIGHT:  No.  Thank you, Your Honor.

22         THE COURT:  Mr. Bostic?

23         MR. BOSTIC:  No, sir.

24         THE COURT:  Mr. Taylor?

25         MR. TAYLOR:  No, Your Honor.

1       THE COURT: Mr. Evans, I know this is not what you

2 wanted to hear. I hope you can follow the spirit of your

3 statement in allocution and seek that personal redemption and

4 I wish you the very best.

5       Ask the Marshal to declare a recess.

6       (Proceedings concluded at 11:20 a.m.)

7

8

9

10

11

12 "I certify that the foregoing is a correct transcript from

13 the record of proceedings in the above-entitled matter.

14

15

16 /s/ Sonia Ferris                 August 22, 2016"

17

18

19

20

21

22

23

24

25